[No. S078664. June 15, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH AVILA, Defendant and Appellant.

**COUNSEL**

Christine J. Levin, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Mary Jo Graves, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens and Sharon L. Rhodes, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**CHIN, J.**—Defendant Joseph Avila was convicted of the first degree murders of Raul Moncada and Robert Navarro, and the attempted murder of David Montoya. (Pen. Code,[1] §§ 187, 189, 664.) The jury also found true the multiple-murder special-circumstance allegation, and allegations that the murders and attempted murder were willful, deliberate, and premeditated, defendant inflicted great bodily injury on Montoya, and defendant personally used a dangerous or deadly weapon, i.e., a knife, in each crime. (§ 190.2, subd. (a)(3); former § 664, subd. (1), now § 664, subd. (a); § 1192.7, subd. (c)(8), (23); § 12022, subd. (b); former § 12022.7, now § 12022.7, subd. (a).) It returned a death verdict, and the trial court entered a judgment of death. This appeal is automatic. (Cal. Const., art. VI, § 11; Pen. Code, § 1239, subd. (b).) For the reasons that follow, we affirm the judgment.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## I. Factual Background

### A. Guilt Phase

#### 1. Prosecution Evidence

In the early morning hours of Saturday, January 12, 1991, a group of friends including Raul Moncada, Robert ("Bobby") Navarro, David Montoya, Jeffrey Winn, Anthony Padilla, Manuel Moreno, Luis Robledo, Lawrence ("Larry") Casas, Anthony ("Tony") Pereira, and Ronald Cordova, were socializing in a parking lot in Riverside after cruising on Magnolia Boulevard. They were unarmed, and had not consumed drugs or alcohol. Pereira and Casas were talking with three young women they had met that evening, Evelyn Quintana, Pauline Mesa, and Joanie Olsen.

Testimony from various eyewitnesses to the events at issue, including Montoya, Winn, Padilla, Moreno, Robledo, and Casas, and the testimony and prior statements of Quintana and Mesa, established the following.

A dark-colored vehicle, identified by Moreno and Mesa as an Impala, pulled into the parking lot. Defendant and one or two other men got out and walked toward the group of friends. The men told at least two of the women to get in the car. The women refused to leave, and defendant became irate. Padilla heard Pereira say "Carmelos," which Padilla did not recognize, but assumed was a gang name. Defendant said "Crown Town" or "Corona." Pereira and Montoya briefly argued with defendant, and someone from defendant's group suggested they go "one-on-one." Montoya said defendant was free to take the women, and said "[t]here's no big problem here." The confrontation appeared to dissipate, and Montoya and his friends started toward their vehicles.

At some point toward the end of the confrontation, defendant broke off from the group and went to Magnolia Boulevard. Moreno testified he saw defendant reach inside the Impala, and "grab something." Moreno and several other witnesses also observed defendant flag down someone in a different vehicle on the street. That vehicle entered the parking lot, and defendant reached inside it. He then ran behind bushes toward a Honda Prelude in which Montoya was sitting. Defendant was carrying a large knife with an approximately six-inch blade. Montoya started to roll up the passenger window. Defendant grabbed the top of the window, shattering it. Defendant stabbed at Montoya more than 20 times, cutting Montoya's bicep in half, and cutting his leg. Montoya lay in the driver's seat, kicking, with his feet out the window. When defendant ran behind the Prelude, Montoya escaped out the passenger window, fearing that defendant would attack him from the driver's side of the vehicle.

Defendant then ran to Moncada's red Ford Escort. Defendant stabbed Moncada, who was standing outside the vehicle, in the heart, killing him. He tried to open the door to Casas' vehicle, but it was locked, and the window closed. Defendant proceeded to the next vehicle, a black truck in which Navarro was sitting in the driver's seat. He stabbed Navarro in the heart through the open truck window, killing him. Defendant was apprehended more than four years later on September 19, 1995, at the Los Angeles International Airport.

Two to three hours after the attacks, Mesa, Quintana, and Olsen were separately interviewed by police. The interviews were tape-recorded and at trial played for the jury. Mesa told police she saw "Joey" stab all three victims, Quintana said "Joey" broke "Manuel's" car window and tried to "stab the guy that got stabbed in the arm," and Olsen said "Joey" was the only one with a knife. Police showed the women a photograph of defendant; they each identified defendant as "Joey." At trial, Montoya identified defendant as his assailant, and Padilla testified defendant was the person who went to the passenger side of the Prelude, and who attacked Moncada.[2] Padilla, and Senior Investigator Clark from the Riverside County District Attorney's Office, testified that Padilla identified defendant in a pretrial photographic lineup.

The examining pathologist testified that stab wounds on Moncada and Navarro were consistent with a knife that was approximately five inches in length and one inch wide. Both murder victims had defensive wounds, and toxicology analysis of their blood did not show the presence of either alcohol or drugs.

### 2. Defense Evidence

Defendant presented no evidence.

### B. Penalty Phase

### 1. Prosecution Evidence

Guillermo Gonzalez Valencia testified that he befriended defendant, whom he knew as "Jose," in Mexico. Gonzalez drove a tractor-trailer truck. One evening at the end of December 1992, defendant was at Gonzalez's house,

---

[2] In addition, Robledo testified that the same person he saw "sneaking up" to the Prelude with a knife also attacked Moncada and Navarro. Casas testified that the same person who ran up to the Prelude also attacked Moncada and Navarro. Winn testified that the same person attacked Montoya and Moncada, and then headed toward Navarro's vehicle. Moreno testified that the same person attacked Montoya and Moncada.

and started to roll a marijuana cigarette. Gonzalez asked him to leave. The next day, at around midnight, Gonzalez heard a noise outside his home. When he investigated, he saw defendant and another man running away. The tires on Gonzalez's tractor-trailer had been punctured.

About six days after this incident, Gonzalez and his friend Guillermo Lopez Reynoza encountered defendant outside a church. Gonzalez asked defendant why he had cut Gonzalez's tires, and asked him to pay for the damage. Defendant refused. Gonzalez and defendant agreed they did not want to fight. Defendant took out a pencil from his back pocket. As he did so, Gonzalez said, "I didn't come to fight." Defendant reassured Gonzalez it was only a pencil. Defendant then discarded the pencil, pulled out a four-to-six-inch knife, and stabbed Gonzalez and Lopez. Gonzalez was hospitalized for about 10 days, required surgery to repair his spleen, and was unable to work for three months. Lopez was hospitalized for nearly two months, and was unable to work for about four months.

Navarro's parents and sister testified regarding his altruism, gregariousness, and mechanical ability. Moncada's mother, sister, and cousin testified regarding his kindness, maturity, and artistic talent, and his eager anticipation of leaving on a mission for The Church of Jesus Christ of Latter-day Saints later that year. Montoya testified regarding the effect the murders had on him and the victims' other friends.

### 2. *Defense Evidence*

Rosalinda Recendez Corona, defendant's mother, testified that defendant was born July 12, 1969, when Rosalinda was about 22. She had four sons, the oldest of whom was murdered after the capital crime. Rosalinda confessed she had not been affectionate with defendant and lacked parenting skills. She beat her children "like animals" in order to discipline them. Rosalinda worked several jobs in order to support the family. Relatives assisted in raising her children.

Defendant's father, Edward Avila, was often incarcerated, and the relationship between defendant's parents ended after three years. Edward beat Rosalinda, and "probably" did so when she was pregnant with defendant. The family moved frequently until defendant was about four years old.

When defendant was about four years old, he was caught in the axle of a vehicle and dragged down the street. He was bruised all over his body, but had no serious injuries.

Also when defendant was about four years old, Rosalinda began a relationship, and at some point had a son, with Manuel Diaz. For several years, Diaz

lived with Rosalinda and her family. Diaz used heroin, beat Rosalinda, and was incarcerated more than once. He had no relationship with defendant. Rosalinda's relationship with Diaz ended in the late 1970's or early 1980's.

When defendant was about five or six years old, his father Edward began visiting him and taking him to amusement parks and other locations.

When defendant was about seven years old, Rosalinda met and eventually married Michael Corona. This relationship lasted approximately 10 years. Michael used and sold heroin, and was not affectionate to defendant.

In 1982, when defendant was in junior high school, Rosalinda had a son with Raymond Salgado. Salgado used heroin and studied the occult, including Satanism. Once after an argument between Rosalinda and Salgado, Salgado told defendant and his brother that if their mother did not come home, he was going to kill himself. Salgado began cutting his arm with a knife. The boys became hysterical, and ran to the location where their mother was staying. Rosalinda called police, who removed Salgado in a straightjacket. The boys helped Rosalinda clean up the pieces of flesh and blood. On another occasion, Salgado slit his stomach open in front of the boys. Rosalinda was not certain, however, whether defendant witnessed this event. Although Rosalinda obtained a restraining order against Salgado, he continued to "torment[]" them, causing Rosalinda to move her children from Madero to Corona.

Rosalinda suffered from nervous breakdowns and used prescription sedatives and stimulants before and after defendant was born. In the 1980's, when her doctor ceased prescribing these medications, she became addicted to heroin for about five years. She also used cocaine and methadone. She became unable to work, and sold heroin and cocaine to support her habit. In 1983 or 1984, when defendant was about 15, she was incarcerated for 14 months for a drug-related offense. After she was released, she began using drugs again. Rosalinda did not know with whom defendant lived while she was incarcerated. In 1990, Rosalinda became paralyzed, and was then able to end her drug addiction.

Defendant had no unusual medical conditions or learning disabilities growing up. Rosalinda testified he was a good child. She had no recollection of how he performed in school. It was "[t]otally out of his character to be violent." Rosalinda loved defendant and wanted him to live.

Defendant also presented the testimony of individuals he met in Mexico. Juanito Aguirre and his mother, Emilia Dedios, testified about defendant's kindness toward him. Juanito had cerebral paralysis, and was confined to a wheelchair. Defendant cooked meals for him, and took him out to eat and for

walks in the park or downtown. Juanito testified that defendant was "like a brother to me." Defendant did not tell Juanito he was in Mexico to avoid apprehension for murder.

Jose Gregorio Jimenez Quintero testified that defendant worked for him in Mexico for approximately one month on a remodeling project for the military. Defendant was one of the best workers Jose ever had, and was respected by his coworkers. Defendant also was generous with Jose and others.

In 1993, Julian Jimenez Villa was the director of a rehabilitation center in Mazatlan. Defendant participated in a voluntary rehabilitation program in which he committed to "find Christ" and try to change who he was. After three months, Julian saw a change in defendant. He assisted newcomers to the center, studied scripture, and discussed his spiritual experience with people living on the street. Defendant became a counselor at the center, and performed well in this position. Julian did not know defendant was hiding in Mexico because he was wanted for two murders in the United States.

Maria Louisa Carajal Moreles knew defendant when he was active in the church connected with the Mazatlan rehabilitation center. Defendant gave Maria's mother hope that her own son, Maria's brother, would change and stop using drugs. Maria's brother did change, and was now an attorney.

### 3. Rebuttal Evidence

Frank Lira testified he was housed in the same area as defendant in the Riverside County jail from 1995 through 1997. Defendant and several others physically assaulted other inmates; on one occasion they beat another inmate and took his commissary card. Once, after defendant and others had beaten an inmate, defendant told Lira he "just had to relieve some stress."

## II. Discussion

### A. Guilt Phase Issues

#### 1. Denial of Keenan Counsel and Removal of Counsel

Defendant contends that the trial court erred by refusing to appoint *Keenan* counsel, refusing to grant a reasonable continuance, and removing his counsel of choice, in violation of various constitutional rights.[3] (*Keenan v. Superior*

---

[3] As to this, and almost every other appellate claim, defendant contends the alleged error infringed his constitutional rights. In those instances in which he did not present constitutional theories below, it appears that either (1) the appellate claim is one that required no objection to

*Court* (1982) 31 Cal.3d 424, 430 [180 Cal.Rptr. 489, 640 P.2d 108] [trial court has discretion under statutes governing appointment of counsel to appoint a second defense attorney to assist in defense of a capital case].) We disagree.

### a. *Factual background*

The capital crimes occurred on January 12, 1991. Defendant was apprehended on September 19, 1995, and initially represented by the Riverside County Public Defender. On June 21, 1996, after receiving numerous continuances of the preliminary hearing, the public defender declared a conflict, and was removed as counsel. The criminal defense panel was appointed, and the case was assigned to John Aquilina. The preliminary hearing was held on October 24, 1996, and defendant was arraigned in superior court on December 19, 1996. In December 1997, the parties agreed on an April 6, 1998 trial date, and trial was set for that date.

On March 5, 1998, Aquilina informed the court that he was not ready to proceed to trial. He explained that he was assigned to two other cases, one of which, Hartsch, was ready to proceed to trial, and the other, Lee, nearly ready. Aquilina stated that earlier that week, the criminal defense panel had attempted to reassign the case to a different attorney who was more available, but that "fell through the cracks."

The prosecutor strongly objected to both "protracted delay" of the trial date past May 1998, and reassignment of the case to different counsel. He noted that he had grave concerns about the availability of one of his witnesses, a victim's parent, who had cancer. He also noted that the case had previously been assigned to different counsel. Aquilina stated that "the reason for the attempt to re-assign this matter was to speed up the case, not to delay matters." The court responded that its "experience, unfortunately, has been that when that happens, it usually has the opposite effect." At a subsequent hearing, the trial date was moved to April 13, 1998.

On April 7, 1998, defendant filed a motion to continue the trial to a date after May 1, 1999, or more than eight years after the capital crimes occurred. (§ 1050.) In a declaration filed in support of the motion, counsel declared that

---

preserve it, or (2) the new arguments are based on factual or legal standards no different from those the trial court was asked to apply, but raise the additional legal consequence of violating the Constitution. "To that extent, defendant's new constitutional arguments are not forfeited on appeal." (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581].) No separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or "gloss" raised for the first time here. (*Ibid.*)

based on his lack of investigation and preparation, he would not be ready for trial for at least 12 months. His efforts to obtain second counsel, or to have the case reassigned to counsel who would be ready for trial before May 1999, had been unsuccessful.

At the April 9, 1998 hearing on the motion to continue, Aquilina stated that the prosecutor only recently had started to object to defense requests for a continuance or insist that the matter proceed to trial. He also said that he organized his capital caseload by working on each case in the order in which it was assigned to him. He received the assignment in Hartsch first, Lee second, and this case third, and had worked on them in that order. He found it "impossible to work on more than one and one-half of these capital cases at any one time." As a result, he had "devoted [his] full attention to the Hartsch matter, partial attention to the Lee matter, and very little, if any, attention to the Avila matter." He suggested that if the court wanted to discuss the Avila investigation with him, that discussion should occur in camera. The hearing continued in open court.

The court inquired how long a delay would occur if the case was assigned to someone else on the criminal defense panel. Aquilina stated that it was his understanding that each panel attorney was already assigned at least two capital cases set for trial. He further noted that this caseload made it difficult for the attorneys to act as second counsel for each other's cases. He said that if he were able to devote his full-time attention to defendant's case, it was "possible that the matter might be able to proceed to trial later this year."

The court acknowledged Aquilina was busy. It also stated that "the People have a point . . . . [Y]ou're representing to me here . . . [that] you can't even begin to think about getting ready for this case until you've taken care of, in large measure, those other two cases; that you need at least a year, on top of all the time you've already had, and on top of the public defender's rather large amount of time before they were relieved. . . . [T]hese crimes occurred in 1991." While defendant's absence from the jurisdiction contributed to the delay, the court stated it nevertheless had to consider the date of the crimes when "evaluating the problems that the People encounter and the victim's family's issues." The court stated that it needed to know if there was anyone on the panel who could work on the case right away, and how soon that person would be ready. The court was concerned that "if we find somebody else to take over for you, it will make it go even longer than if we left it in your hands . . . ." Aquilina responded, and the court agreed, that the delay "also obviously affects the defendant."

The court then heard from Mr. Finn, who apparently assisted in running the criminal defense panel. Finn described the panel's staffing and workload

challenges, and then stated: "[T]he answer to the Court is simply, no, not within our current people and within our current budget can we reassign this case."

After further colloquy between the court and Finn, the court stated, "From what you're telling me, I essentially only have two options here. I leave it with Mr. Aquilina and give him something approaching the time he says he wants, or we relieve Mr. Aquilina and appoint private counsel." The court stated that if private counsel were appointed, it had "no idea whether they can be ready any sooner than Mr. Aquilina can be. If we leave him on the case, at least he has the advantage of familiarity with the case and the defendant . . . ." The court subsequently stated that it needed to find out if anyone was available to take over the case "and be ready any faster than Mr. Aquilina can. And I need to find that out before I can make a decision."

The prosecutor stated that the delay was "working a great injustice" to the victims' families, and that it was "incumbent upon the Court to . . . find competent counsel." He noted defendant's case was not "complicated," and mentioned other cases in which counsel had been obtained outside the criminal defense panel.

After further argument by the prosecutor, and by the apparent prosecutor in the Hartsch case, Aquilina observed that one factor for the court to consider in determining whether to change counsel was "whether the defendant consents to a change of counsel or objects." The court inquired of defendant whether he would like the court to relieve Aquilina and attempt to find someone who could get to trial faster, or retain Aquilina, "hoping he can get to trial as fast as he can in light of his heavy caseload of complex homicides and death penalty cases." Defendant answered, "I would like to keep Mr. Aquilina." The court asked, "Even if it means going for a year or more waiting to get to trial?" Defendant said, "Yes."

The court inquired of Aquilina whether appointment of second counsel would assist him in getting to trial any faster. Aquilina responded, "Obviously second counsel would help." The court said, "Let's assume for argument's sake that you had a second attorney to assist you on this case, not because it's a complex case, but in order to assist you to get it to trial faster. . . . [A]ssuming the case was prepared and ready with Keenan counsel, what's the earliest you could be available?" Aquilina responded, "[W]ith one proviso, I believe January [1999], because the Lee matter . . . would probably go some time in November or December. Although yesterday I heard Lee may not go until January." Aquilina anticipated Hartsch would be tried in July 1998. Aquilina stressed that while he would be physically available to try defendant's case, he did not know "of any defense counsel that has tried three

capital cases in a 12-month period," and he was disinclined to be the first to do so. The court then inquired whether if Hartsch was tried in July 1998, and Lee tried in January 1999, Aquilina could, with "extra help," be ready to try defendant's case between these trials, by October 1998. Aquilina responded, "[I]t's possible."

The court vacated the April 13, 1998 trial date, and the matter was put over so the court could research what attorneys might be available.

On April 13, 1998, the trial court made findings on the record. In particular, it found that Aquilina "has had a reasonable time to prepare the case, and that due to his . . . heavy caseload and matters beyond his control, he's functionally unavailable to try the case, under Penal Code [s]ection 987.05. So as soon as private counsel can be found, I'm going to ask Mr. Aquilina to turn over all his discovery to new counsel" and return any public funds received for preparation of the case. Aquilina did not object. The court noted that a new attorney had not yet been located and scheduled a hearing in two days.

At the April 15, 1998 hearing, the court informed the parties that Bruce Cormicle was available to take the case and give it "top priority." The court requested Aquilina bring all of his discovery to a hearing on April 17, 1998. Aquilina agreed, and again made no objection to the replacement of counsel. On April 17, 1998, Cormicle appeared, confirmed he was available, and stated he anticipated he would be ready for trial in less than 13 months. Aquilina was relieved and turned over his discovery, again without objection.

b. *Analysis*

Defendant contends that Aquilina "was removed over the objection of both Mr. Aquilina and [defendant] on the request of the prosecutor when Mr. Aquilina requested a five-month continuance with the assistance of *Keenan* counsel or a 12-month continuance if he tried the case alone." As the above factual recitation demonstrates, while defendant stated he would rather keep Aquilina and delay trial than obtain new counsel and go to trial more quickly, no objection was made either when the court found that Aquilina should be removed, or when he was actually removed.

 Moreover, contrary to defendant's assertion, Aquilina never moved for *Keenan* counsel. Under section 987, subdivision (d), the court may appoint a second attorney in a capital case "upon a written request of the first attorney appointed. The request shall be supported by an affidavit of the first attorney setting forth in detail the reasons why a second attorney should be appointed." No such written request was made in this case. Nor did Aquilina

orally request second counsel. Rather, the possibility of *Keenan* counsel was simply discussed by Aquilina and the court as one option to accelerate the trial date. Indeed, Aquilina stressed to the court that while he might be physically available sooner with the appointment of *Keenan* counsel, he knew of no one who had tried three capital cases in a 12-month period, and he was disinclined to be the first. Hence, because Aquilina did not request *Keenan* counsel, the trial court never ruled on such a request.

Nor, contrary to defendant's assertion, did the trial court err in denying Aquilina's request for a continuance of at least 12 months, and removing him as defense counsel. " 'A court may remove appointed counsel both to "prevent substantial impairment of court proceedings" [citation] and when counsel, without good cause, does not become ready for trial (§ 987.05).' (*People v. Cole* (2004) 33 Cal.4th 1158, 1188 [17 Cal.Rptr.3d 532, 95 P.3d 811] . . . .) A trial court's removal of appointed counsel for an indigent defendant is reviewed for abuse of discretion." (*People v. Mungia* (2008) 44 Cal.4th 1101, 1119 [81 Cal.Rptr.3d 614, 189 P.3d 880].)

We find no abuse of discretion. Under section 987.05, "[i]n cases where counsel, after making representations that he or she will be ready for . . . trial, and without good cause is not ready on the date set, the court may relieve counsel from the case . . . ." Here, the parties agreed on an April 6, 1998 trial date, an agreement that implied counsel expected to be ready on that date. Section 987.05 further provides that in establishing a reasonable time to prepare for trial, a trial court "shall not consider counsel's convenience, counsel's calendar conflicts, or counsel's other business." It seems appropriate to similarly exclude these factors in determining whether counsel has shown good cause for his lack of readiness for trial. Here, the only reason cited by Aquilina for his lack of readiness in April 1998, and need for a minimum 12-month continuance, was his competing capital caseload.

The trial court also properly removed counsel to prevent substantial impairment of the court proceedings. (*People v. Cole, supra,* 33 Cal.4th at p. 1188.) The capital crimes occurred in January 1991, defendant was not apprehended until September 1995 because he fled the jurisdiction, the public defender who first represented defendant sought continuances of the preliminary hearing for nearly a year before being conflicted out, and Aquilina, once appointed, did little work on the case for nearly two years, and then sought to delay trial for at least another year. Indeed, Aquilina sought to continue the

trial to a date "after May 1, 1999." Aquilina thus gave no assurance he would be prepared for trial on May 2, 1999, but rather only represented that he would be ready at some indeterminate point *after* a year had passed. In addition, a prosecution witness was battling cancer. While defendant expressed a preference for retaining Aquilina, that factor is not dispositive. (*People v. Mungia, supra,* 44 Cal.4th at p. 1124.) The " 'essential aim "is to guarantee 'an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.' " ' " (*Ibid.*)[4]

Nor, contrary to defendant's assertion, did the trial court err in failing to hold an in camera hearing on Aquilina's defense investigation. While Aquilina stated he did not feel comfortable discussing the details of the defense investigation in open court, he never requested a hearing. Nor was one necessary. Contrary to defendant's assertion, Aquilina never "made an offer of proof that a thorough investigation was underway." Rather, counsel represented that, following the preliminary hearing, he had done little work on the case and would not be ready for trial for over a year because of competing capital case assignments. These were the pertinent facts the trial court considered in determining whether to remove Aquilina.

Defendant asserts he "is aware of no other capital case where defense counsel was removed over the objection of both defense counsel and the defendant on the motion of the prosecutor." As noted above, there was no objection, and defendant's stated preference for Aquilina was not dispositive in determining whether defense counsel should be removed.

■ Finally, defendant claims judicial bias in the court's comments and removal of Aquilina. We have rejected defendant's claims the trial court erred in failing to appoint *Keenan* counsel and in removing Aquilina as defense counsel, and our review of the court's challenged comments reveals no error, let alone evidence of bias. Moreover, "a trial court's numerous rulings against a party—even when erroneous—do not establish a charge of judicial bias, especially when they are subject to review." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1112 [40 Cal.Rptr.3d 118, 129 P.3d 321].) Defendant fails to demonstrate any judicial misconduct or bias, let alone misconduct or bias that was "so prejudicial that it deprived defendant of ' "a fair, as opposed to a perfect, trial." ' " (*Ibid.*)

---

[4] For the same reasons we conclude the trial court acted properly in removing Aquilina, there was also no error in denying the motion to continue trial to a date after May 1, 1999.

## 2. *Denial of Motion to Exclude Identification Evidence*

Defendant claims that Montoya's and Padilla's pretrial and in-court identifications were tainted by unduly suggestive procedures in violation of his right to due process and a fair trial. Not so.

### a. *Factual background*

On June 14, 1996, Investigator Clark met separately with Padilla and Montoya. In recorded interviews, he discussed at length the events on January 12, 1991. At the end of each interview, he showed them two photographic lineups. Lineup one contained defendant's photograph in the number two position.[5] Padilla identified defendant, and Montoya selected two photographs from lineup one, one of which was defendant, and two photographs from lineup two.[6]

At a hearing on defendant's motion to exclude Montoya's and Padilla's identifications of defendant at trial, Montoya, Padilla, and Investigator Clark testified. As relevant here, Padilla testified that he gave police a description of the assailant the morning after the attacks. He was not sure if he had been shown any photographs at that time, but thought "maybe a series of photographs." He was not sure, but did not think he had identified possible suspects from the photographs. He did not recall to whom he spoke or whether the person was wearing a uniform, and could not describe the person, except to identify him as "male."

Padilla testified he was also shown photographs at his apartment by Clark about a year or two before his current testimony. Padilla was shown about 12 photographs in two groups of six. He identified one suspect, and was "pretty certain" of his identification.

Clark testified that he had only shown photographs to Montoya and Padilla on June 14, 1996. He had never heard "before today" that Padilla had been

---

[5] Before examining the lineups, both Montoya and Padilla read and signed an admonition that provided: "You will be shown a photographic lineup by the Riverside County District Attorney's Office. When you examine the photographs, please keep in mind that people may or may not alter their appearance while committing a crime. You are under no obligation to identify anyone from this photographic lineup and the mere fact that the Riverside County District Attorney's Office is showing these photographs in no way means that a photograph of the person(s) responsible for the crime is/are present."

[6] At trial, Montoya identified defendant as his assailant and testified regarding his uncertainty during the pretrial photographic lineup. Padilla identified defendant as the person who went to the passenger side of the Prelude, and who attacked Moncada, and testified regarding his pretrial photographic lineup identification of defendant. Investigator Clark testified regarding Montoya's and Padilla's selections during the photographic lineup.

shown photographs on January 13 or 14, 1991. Clark had both Montoya and Padilla read and sign the admonition form when he gave them the lineups to review.

Defense counsel argued without elaboration that the lineup was unduly suggestive because defendant's photograph was "distinctive as compared to and contrasted to the other individuals." As an "additional basis," defense counsel asserted that Padilla was apparently shown photographs of possible suspects soon after the crimes, and these photographs were not preserved "in any fashion." Counsel therefore argued that Padilla's trial identification should be excluded on due process grounds. The prosecutor said that the People were unaware of any photographs that were shown to Padilla the night of the capital crimes or on January 14, 1991. He "had no reports reflecting that type of an interview, nor have I been made aware of any photo lineups that were ever shown to Mr. Padilla."

The trial court found the lineups were not unduly suggestive given defendant's photograph was "very, very similar to [photographs] two through six" on lineup one. It observed that defense counsel had not identified as suggestive any particular characteristic of the lineup, and the court saw none. It therefore denied the motion on that ground. The court also found, based on the transcripts of the interviews and the hearing testimony, that Investigator Clark did nothing to suggest any photograph to either witness. Rather, Clark had the witnesses read the standard admonition, and merely orally confirmed their identifications once made. Finally, the court found that Padilla's identification in 1996 was not tainted because there was no evidence that Padilla was shown defendant's photograph soon after the 1991 incident and failed to make an identification. The court left open the possibility defendant could raise the issue again if evidence were found, but stated, "I don't think the possibility that he was shown a series of photographs that he now can't recall, and in any event he doesn't think he made a[n] identification, is sufficient to taint the subsequent photo lineup or any" in-court identification.

### b. *Analysis*

■ "Due process requires the exclusion of identification testimony only if the identification procedures used were unnecessarily suggestive and, if so, the resulting identification was also unreliable." (*People v. Yeoman* (2003) 31 Cal.4th 93, 123 [2 Cal.Rptr.3d 186, 72 P.3d 1166].) The question is not whether there were differences between the lineup participants, but "whether anything caused defendant to 'stand out' from the others in a way that would suggest the witness should select him." (*People v. Carpenter* (1997) 15 Cal.4th 312, 367 [63 Cal.Rptr.2d 1, 935 P.2d 708].) We independently review "a trial

court's ruling that a pretrial identification procedure was not unduly suggestive." (*People v. Kennedy* (2005) 36 Cal.4th 595, 609 [31 Cal.Rptr.3d 160, 115 P.3d 472].)

On appeal, defendant once again points to no particular characteristic of the participants in the photo lineups that he contends made the lineups impermissibly suggestive. Nor does our independent review of the lineups reveal any suggestion of " 'the identity of the person suspected by the police.' " (*People v. Ochoa* (1998) 19 Cal.4th 353, 413 [79 Cal.Rptr.2d 408, 966 P.2d 442].)

Rather, defendant contends Clark asked Montoya and Padilla leading questions. Our review of the transcripts reveals no such suggestiveness in Clark's inquiries. Both Montoya and Padilla were first admonished in writing that they were "under no obligation to identify anyone from th[e] photographic lineup," and "the mere fact that the Riverside County District Attorney's Office is showing these photographs in no way means that a photograph of the person(s) responsible for the crime is/are present." Clark then told each witness that the person's appearance on the night of the incident might be different from the photograph, asked Padilla if he "recognized anybody," and asked Montoya if he saw the perpetrator. He then confirmed which photographs they selected.

Defendant further contends the lineups were unduly suggestive because the identifications occurred more than five and one-half years after the capital crimes. While this fact goes to the *reliability* of the identification, it does not affect a determination whether the lineup was unduly suggestive. (*People v. Kennedy, supra,* 36 Cal.4th at p. 608.) Because we have concluded the lineup was not unduly suggestive, we need not consider whether it was reliable under the totality of the circumstances. (*Ibid.*)

Defendant also contends that the identification procedure was unduly suggestive because, while law enforcement may not have told Padilla and Montoya that they had evidence defendant committed the crimes, or that defendant was in custody, "the only reasonable inference is that something about the case had changed after over five years of inaction" on the part of police. Of course, "[a]nyone asked to view a lineup would naturally assume the police had a suspect." (*People v. Carpenter, supra,* 15 Cal.4th at p. 368.) This circumstance does not render the lineup unduly suggestive. (*Ibid.*)

Defendant contends that Montoya's preliminary hearing testimony, which occurred several months after the photographic lineup, demonstrates the identification process was unduly suggestive. In particular, defendant claims Montoya testified he was shown photographs of defendant by the district

attorney at the time the preliminary hearing was formerly scheduled to be held, and was then postponed, and that Montoya believed he identified defendant in those photographs. This assertion misstates the record. Montoya actually testified that the first time he *saw defendant* after the capital crimes "was the first preliminary hearing that should have been in June or July." There was no testimony about viewing photographs at this earlier proceeding. Rather, Montoya testified that in June 1996, Investigator Clark showed him photographs. Montoya recalled that after viewing the photographs, he saw defendant in court.

Defendant further contends the trial court improperly required the defense to prove the lineup evidence was tainted. Defendant does bear the burden of demonstrating the identification procedure was unduly suggestive. (*People v. Carter* (2005) 36 Cal.4th 1114, 1164 [32 Cal.Rptr.3d 759, 117 P.3d 476]; *People v. Ochoa, supra*, 19 Cal.4th at p. 413; *People v. DeSantis* (1992) 2 Cal.4th 1198, 1222 [9 Cal.Rptr.2d 628, 831 P.2d 1210].) In addition, and also contrary to defendant's claim, Padilla did not testify that he was shown photographs on the night of the crime and could not identify defendant. Rather, Padilla said he was not certain whether he was shown photographs and, while he was unsure, did not think he had identified anyone. Investigator Clark testified he was unaware Padilla had ever been shown photographs in January 1991.

Defendant further contends without elaboration that because several prospective jurors and Pauline Mesa were exposed to pretrial publicity, trial counsel was ineffective in failing to "renew his motion to exclude the eye-witness identification once he was clearly aware of the pre-trial publicity without inquiring as to whether a photograph was published in any of these articles." While his claim is not entirely clear, to the extent he claims Montoya and Padilla might have seen a media photograph of defendant before the photographic lineup, he cites nothing in the record that would support this assertion, nor how this factor would affect our determination that the lineup itself was not unduly suggestive. For these same reasons, he fails to demonstrate any basis on which to conclude trial counsel was ineffective in failing to renew the motion to exclude Montoya's and Padilla's identifications of defendant following Mesa's trial testimony.

Defendant contends that the trial court demonstrated judicial bias by (1) asking Clark whether he read the admonition to Montoya and Padilla or asked them to read it to themselves, but not asking questions that assisted defendant, such as why the prosecution waited more than five years to conduct the lineup, why only Montoya and Padilla were asked to participate, and whether the witnesses were exposed to any pretrial publicity; and (2) "trust[ing] the prosecutor's unsworn testimony over Padilla's sworn

testimony that he had been previously shown photographs of a suspect and was unable to make an identification." Not so. The court acted properly in asking for clarification regarding the admonition procedure, which was ambiguous in the transcript of Clark's interview with Padilla. In addition, the questions defendant now claims the trial court should also have asked were irrelevant to a determination of whether the identification procedure was unduly suggestive. We have rejected above defendant's claim that there was any definitive testimony that Padilla was shown photographs by law enforcement in January 1991, and failed to identify a suspect. Once again, a "trial court's numerous rulings against a party—even when erroneous—do not establish a charge of judicial bias, especially when they are subject to review." (*People v. Guerra, supra,* 37 Cal.4th at p. 1112.) Defendant fails to demonstrate any judicial misconduct or bias, let alone misconduct or bias that "was so prejudicial that it deprived defendant of ' "a fair, as opposed to a perfect, trial." ' " (*Ibid.*)

### 3. *Sufficiency of the Evidence of Intent to Kill Montoya*

Defendant contends there is insufficient evidence he intended to kill Montoya, requiring reversal of his attempted murder conviction. Not so.

■ "When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27 [82 Cal.Rptr.3d 323, 190 P.3d 664].) We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781].) In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68].) "This standard applies whether direct or circumstantial evidence is involved." (*People v. Catlin* (2001) 26 Cal.4th 81, 139 [109 Cal.Rptr.2d 31, 26 P.3d 357].) "[I]t is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may . . . be inferred from the defendant's acts and the circumstances of the crime." (*People v. Smith* (2005) 37 Cal.4th 733, 741 [37 Cal.Rptr.3d 163, 124 P.3d 730].)

■ Here, defendant repeatedly attempted to stab Montoya, an unarmed and trapped victim, and succeeded in stabbing him in the arm and leg. This

evidence alone is substantial evidence of defendant's intent to kill. (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1552 [25 Cal.Rptr.3d 124] [intent to kill demonstrated in part by evidence of unprovoked attack that rendered unarmed victim prone and defenseless as the defendant repeatedly stabbed him].) In addition, defendant then fatally stabbed Moncada and Navarro, who were members of Montoya's group, inflicting wounds that were, respectively, approximately four and five inches deep and that penetrated their hearts. (See *People v. Bolden* (2002) 29 Cal.4th 515, 561 [127 Cal.Rptr.2d 802, 58 P.3d 931] ["defendant could have had no other intent than to kill" when he plunged the knife deeply into a "vital area of the body of an apparently unsuspecting and defenseless victim"]; see also *People v. Prince* (2007) 40 Cal.4th 1179, 1253 [57 Cal.Rptr.3d 543, 156 P.3d 1015] [similarities between murders support the inference that defendant went to the victim's home "armed with a knife and with the intent to kill"].) The jury convicted defendant of first degree murder for these deaths based on a theory of premeditation, and reasonably could have inferred defendant had the same intent to kill when, immediately prior to the murders, he attacked Montoya in the same manner.[7]

Defendant asserts that the evidence of intent to kill is not substantial because the injury to Montoya was not serious. Of course, the degree of the resulting injury is not dispositive of defendant's intent. Indeed, a defendant may properly be convicted of attempted murder when no injury results. (See *People v. Stone* (2009) 46 Cal.4th 131, 135–136 [92 Cal.Rptr.3d 362, 205 P.3d 272].) The jury reasonably could infer that Montoya avoided further injury solely because he assumed a position from which he could kick at defendant and thus protect his vital organs from immediate injury. (*People v. Gonzalez, supra*, 126 Cal.App.4th at p. 1552 [that the defendant missed the victim's "heart and lungs was fortuitous rather than indicative of the absence of an intent to kill"]; *People v. Lashley* (1991) 1 Cal.App.4th 938, 945 [2 Cal.Rptr.2d 629] [that "the victim may have escaped death" due to "poor marksmanship" does not vitiate intent to kill].)

Defendant also contends "there was a reasonable alternative explanation other than the intent to kill," because he may have merely wanted to "prevent Moreno from driving away with Quintana," or perhaps simply was "following through with Montoya's acceptance of a challenge to engage him in a fight." It is not clear how these motivations would be inconsistent with an

---

[7] Defendant claims the evidence of intent to kill in this case is no stronger than in *People v. Ratliff* (1986) 41 Cal.3d 675, 695–696, 698 [224 Cal.Rptr. 705, 715 P.2d 665]. However, as we explained in *People v. Arias* (1996) 13 Cal.4th 92 [51 Cal.Rptr.2d 770, 913 P.2d 980], in *Ratliff*, we simply held that the "evidence of intent to kill was not so conclusive as to render harmless an erroneous *failure to instruct* on that issue." (*Arias,* at pp. 129–130, fn. 10.) Here, the jury was instructed that to convict defendant of Montoya's attempted murder, it had to find defendant acted with the intent to kill. Substantial evidence supports that determination.

intent to kill. (*People v. Arias, supra,* 13 Cal.4th at p. 162 [if "jury found defendant's use of a lethal weapon with lethal force was purposeful, an intent to kill could be inferred, even if the act was done without advance consideration and only to eliminate a momentary obstacle or annoyance"].) Even assuming they are inconsistent with such intent, "if the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Farnam* (2002) 28 Cal.4th 107, 143 [121 Cal.Rptr.2d 106, 47 P.3d 988].)

### 4. *Sufficiency of the Evidence Defendant Stabbed Navarro*

Defendant contends the record contains insufficient evidence he stabbed Navarro, necessitating that we vacate his murder conviction and the multiple-murder special-circumstance finding. The conviction was supported by substantial evidence.

In her January 12, 1991 taped statement to police, which was played for the jury, Pauline Mesa recounted seeing defendant, with whom she was acquainted, stab a man in a truck. The victim in the truck was Navarro.

Lawrence Casas testified that "the guy," identified by other witnesses as defendant, approached Navarro's truck in which Navarro was sitting in the driver's seat with his window open. Defendant was carrying a knife with a blade at least six inches long. Casas saw defendant reach into Navarro's window or doorway and struggle "back and forth."

Luis Robledo testified that he also saw the assailant, who was the same person who attacked Montoya and Moncada, and who was identified by others as defendant, go towards the truck after attacking Moncada. Robledo saw defendant make stabbing motions at Navarro through the open truck window.

This testimony constitutes substantial evidence that defendant stabbed Navarro. Absent exceptions not pertinent here, "the testimony of a single witness is sufficient for the proof of any fact." (*People v. Richardson* (2008) 43 Cal.4th 959, 1030 [77 Cal.Rptr.3d 163, 183 P.3d 1146]; see *People v. Najera* (2008) 43 Cal.4th 1132, 1136–1137 [77 Cal.Rptr.3d 605, 184 P.3d 732].) Contrary to defendant's implication, lighting conditions on the night of the crimes, inconsistencies within certain testimony or with prior statements, differences between the witnesses' estimates of defendant's height and his actual height, and whether defendant could physically complete the crimes in

the time and manner described by certain witnesses, were matters for the jury to determine.

### 5. *Instructional Issues*

a. *Requested instructions on voluntary manslaughter, attempted voluntary manslaughter, and the effect of provocation on defendant's premeditation and deliberation*

Defendant contends the trial court erred in refusing to instruct on voluntary manslaughter and attempted voluntary manslaughter as lesser included offenses of murder and attempted murder, and failing to instruct that provocation was a circumstance reducing first degree murder to second degree murder. We find no error.

The jury was instructed that, in order to find defendant guilty of premeditated first degree murder or premeditated attempted murder, it must find an intent to kill on the part of defendant that "was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation." (CALJIC Nos. 8.20, 8.67.) It was also instructed that "cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation." (CALJIC Nos. 8.20, 8.67.) Second degree murder was defined as "the unlawful killing of a human being with malice aforethought when the perpetrator intended unlawfully to kill a human being but the evidence is insufficient to prove deliberation and premeditation." (CALJIC No. 8.30.) The jury was also instructed on assault with a deadly weapon as to Montoya. The court refused to instruct on voluntary manslaughter and related principles, including CALJIC Nos. 8.40 (defining voluntary manslaughter), 8.42 (defining a sudden quarrel or heat of passion and provocation), 8.43 (the effect of a cooling period), 8.44 (no particular emotion alone constitutes heat of passion), 8.50 (distinguishing murder and manslaughter), 8.72 (defendant given the benefit of any reasonable doubt on whether the crime was murder or manslaughter), and 8.73 (jury may consider whether evidence of provocation not sufficient to reduce the homicide to manslaughter had any bearing on whether defendant killed with premeditation and deliberation). (§ 192.)

■ " 'The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request.' " (*People v. Rogers* (2006) 39 Cal.4th

826, 866 [48 Cal.Rptr.3d 1, 141 P.3d 135].) "Conversely, even on request, the court 'has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction.' " (*People v. Cole, supra*, 33 Cal.4th at p. 1215.) This substantial evidence requirement is not satisfied by " '*any* evidence . . . no matter how weak,' " but rather by evidence from which a jury composed of reasonable persons could conclude "that the lesser offense, but not the greater, was committed." (*People v. Cruz* (2008) 44 Cal.4th 636, 664 [80 Cal.Rptr.3d 126, 187 P.3d 970].) "On appeal, we review independently the question whether the trial court failed to instruct on a lesser included offense." (*People v. Cole, supra*, at p. 1215.)

### 1. *Failure to instruct on voluntary manslaughter and attempted voluntary manslaughter*

"Manslaughter, an unlawful killing without malice, is a lesser included offense of murder." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1086 [119 Cal.Rptr.2d 859, 46 P.3d 335]; see § 192.) "Although section 192, subdivision (a), refers to 'sudden quarrel or heat of passion,' the factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation." (*People v. Lee* (1999) 20 Cal.4th 47, 59 [82 Cal.Rptr.2d 625, 971 P.2d 1001]; see *People v. Rios* (2000) 23 Cal.4th 450, 461 [97 Cal.Rptr.2d 512, 2 P.3d 1066] [certain mitigating circumstances will "reduce an intentional, unlawful killing from murder to voluntary manslaughter 'by negating the element of malice' " (italics omitted)].) "The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim." (*People v. Lee, supra*, 20 Cal.4th at p. 59.) "[T]he victim must taunt the defendant or otherwise initiate the provocation." (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306 [82 Cal.Rptr.3d 265, 190 P.3d 616]; see *People v. Manriquez* (2005) 37 Cal.4th 547, 583–584 [36 Cal.Rptr.3d 340, 123 P.3d 614] (*Manriquez*).) The " 'heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances . . . .' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1252 [120 Cal.Rptr.2d 432, 47 P.3d 225] (*Steele*).) " '[I]f sufficient time has elapsed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter.' " (*People v. Daniels* (1991) 52 Cal.3d 815, 868 [277 Cal.Rptr. 122, 802 P.2d 906].)

Here, there is no substantial evidence of provocation. The record indicates that the victims and their friends, who were not armed, were socializing in a

parking lot, and that two of the friends, Pereira and Casas, were talking with three young women, Quintana, Mesa, and Olsen. A dark-colored vehicle pulled into the parking lot. Defendant and one or two other men got out and walked toward the group of friends. The men told at least two of the women to get in the car. The women refused to leave, and defendant became irate. Padilla heard Pereira say "Carmelos," which Padilla did not recognize, but assumed was a gang name. Defendant said "Crown Town" or "Corona." Pereira and Montoya briefly argued with defendant, and someone from defendant's group suggested they go "one-on-one." Montoya said defendant was free to take the women, and said "[t]here's no big problem here." The confrontation appeared to dissipate, and Montoya and his friends started toward their vehicles. None of these events was sufficient "to arouse feelings of homicidal rage or passion in an ordinarily reasonable person." (*People v. Pride* (1992) 3 Cal.4th 195, 250 [10 Cal.Rptr.2d 636, 833 P.2d 643].)

Defendant asserts, however, that there was sufficient evidence of provocation to warrant instruction on voluntary manslaughter because Pereira was the first one to confront defendant, making the victims and their friends the initial aggressors. Contrary to defendant's assertion, Padilla did not so testify. Rather, Padilla testified that as defendant and one or two others started walking toward everyone in the group of friends, Pereira "was the first one to confront them or talk to them." This is not evidence Pereira was initially aggressive. Defendant also relies on Padilla's testimony that Pereira yelled out "Carmelos." Padilla had "no idea" what this term meant, but assumed it was "a gang . . . or something like that." Even assuming it was reference to a gang, and that a gang member might have perceived the statement as some sort of a challenge, the requisite provocation must be one that would provoke an ordinarily reasonable person. (*Steele, supra,* 27 Cal.4th at p. 1252.) Reasonable people do not become homicidally enraged when hearing the term "Carmelos," even if it is understood as a fleeting gang reference or challenge.

Also contrary to defendant's assertion, there is no evidence that during this verbal confrontation, blows were exchanged. Defendant asserts that victim "Montoya personally agreed to fight the Corona men." He relies on Casas' testimony that one person from defendant's group said "they wanted to fight . . . one-on-one with one of us, . . . which one of 'em was man enough to fight him." Casas could not "remember for sure," but thought perhaps Montoya had responded, "[A]ll right, you know, if you want." Again, even assuming this response was made, it is scarcely a comment that would reasonably incite homicidal rage. Defendant also asserts that Olsen testified "there was a *fight* which began that could have included a fist fight prior to

the stabbing." Olsen was asked whether, while the conversation between the two groups occurred, anyone got "into a fight where they were punching each other." She responded, "[I]t could have been . . . I can't actually say that I seen this person do anything, because I did not actually see anybody do anything." This is not evidence of physical contact.

In sum, there was no substantial evidence of provocation to support voluntary manslaughter or attempted voluntary manslaughter instructions, and defendant's request for such instructions was therefore properly denied. Nor, contrary to defendant's assertion, was the jury forced into an "all or nothing" choice between murder and acquittal when the court refused to instruct on voluntary manslaughter. (See *Beck v. Alabama* (1980) 447 U.S. 625, 637 [65 L.Ed.2d 392, 100 S.Ct. 2382]; *People v. Benavides* (2005) 35 Cal.4th 69, 103 [24 Cal.Rptr.3d 507, 105 P.3d 1099].) "[N]o fundamental unfairness or loss of verdict reliability results from the lack of instructions on a lesser included offense that is unsupported by any evidence upon which a reasonable jury could rely." (*People v. Holloway* (2004) 33 Cal.4th 96, 141 [14 Cal.Rptr.3d 212, 91 P.3d 164].) Moreover, the jury was instructed on second degree murder, and accordingly had a choice in evaluating defendant's culpability. (*Schad v. Arizona* (1991) 501 U.S. 624, 646–648 [115 L.Ed.2d 555, 111 S.Ct. 2491] [second degree murder instruction sufficient to ensure verdict's reliability]; *People v. Benavides, supra,* 35 Cal.4th at p. 103.)

### 2. *Provocation as reducing the degree of murder instructions*

In a related claim, defendant contends the trial court erred in failing to instruct the jury on CALJIC Nos. 8.73 and 8.44, and that this error, combined with the prosecutor's misleading argument, was prejudicial. As noted above, CALJIC No. 8.73 would have informed the jury that it could consider whether evidence of provocation not sufficient to reduce the homicide to manslaughter had any bearing on whether defendant killed with premeditation and deliberation. CALJIC No. 8.44 provides that "the heat of passion referred to in the law of manslaughter" is composed of no particular emotion.

There was no error in refusing to give these instructions. We have previously held, in a case that like this one lacked substantial evidence of provocation, that the court was not required to sua sponte instruct in the language of CALJIC No. 8.73. (*Steele, supra,* 27 Cal.4th at pp. 1250–1251.) "Although the court did not use the word 'provocation' in regard to the

degree of murder, it did instruct on 'heat of passion.' It told the jury that for the killing to be first degree murder, it must not have been committed 'under a sudden heat of passion or other condition precluding the idea of deliberation.' (CALJIC No. 8.20.) By specifically referring to heat of passion and generally referring to any other condition precluding deliberation, the court fully instructed on the law relevant to the actual evidence. It did not also have to refer to 'provocation' regarding the degree of murder, which would not have fit the evidence." (*Id.* at p. 1251.) For these reasons, there was no error in failing to instruct in the language of CALJIC No. 8.73 on request or, as defendant suggests, to give this instruction as modified by deleting the reference to manslaughter.[8] (*Steele, supra,* 27 Cal.4th at p. 1251 [rejecting claim that trial counsel was ineffective for failing to request CALJIC No. 8.73].)

Similarly, because there was no substantial evidence defendant committed manslaughter, the trial court properly refused to instruct in the language of CALJIC No. 8.44, which refers to "the law of manslaughter." While defendant notes here that CALJIC No. 8.44 could have been modified to refer to "the law of premeditation, as defined in CALJIC No. 8.20," rather than to manslaughter, he did not request this modification below, and the claim is therefore forfeited. (See *People v. Welch* (1999) 20 Cal.4th 701, 757 [85 Cal.Rptr.2d 203, 976 P.2d 754].) Moreover, such a modified instruction was not necessary because, as noted above, the language of CALJIC No 8.20 adequately instructed the jury. (*Steele, supra,* 27 Cal.4th at p. 1251.)

Defendant contends the trial court evidenced bias by refusing instructions on voluntary manslaughter and instructions that would have allowed the jury to convict defendant of second degree rather than first degree murder. Because the trial court properly declined to instruct on voluntary manslaughter, and adequately instructed on heat of passion as it related to defendant's premeditation and deliberation, no error, let alone bias, is demonstrated.

---

[8] The Attorney General contends that defendant has forfeited the claim that the trial court should have modified CALJIC No. 8.73 by failing to request such modification below. The record is unclear as to whether defendant made such a request and whether the trial court refused to modify. After the trial court stated it would not instruct on CALJIC Nos. 8.72 and 8.73 because they were manslaughter instructions, the prosecutor asked the court for clarification as to CALJIC No. 8.73, and whether it found "insufficient evidence of any provocation to even warrant the reduction" of first degree murder to second degree murder. Defense counsel said, "The defense would ask for it." The trial court responded, "You'd have to modify it and then go into provocation and so forth if you were going to use that to reduce it from first to second degree. It really only goes if you give a manslaughter instruction." Given this ambiguity, we address the claim on the merits.

### b. *Instruction on lying in wait*

Defendant claims the trial court erred and demonstrated its bias when it instructed the jury on lying in wait as a basis for a finding of first degree murder. The prosecutor proceeded on two theories of first degree murder, lying in wait and premeditated murder. The jury was instructed that if it found defendant guilty of first degree murder, and was unanimous on a theory or theories of murder, it was to specify on the verdict forms which theory or theories it chose. As to both victims, the jury expressly found the murders were willful, deliberate, and premeditated, but did not find the murders were also by means of lying in wait. Therefore, even if the trial court erred in instructing on lying in wait, defendant suffered no possible prejudice. Nor would the mere giving of an instruction demonstrate bias. (See *People v. Guerra, supra,* 37 Cal.4th at p. 1112.)

### c. *Instruction on concealing evidence*

Defendant contends the court erred and demonstrated its bias by instructing the jury in the language of CALJIC No. 2.06.[9] Here, the evidence indicated that the perpetrator used a knife during the attacks. The knife was not found at the murder scene.

 Defendant contends the "evidence was insufficient to permit the inference that [defendant] hid or concealed evidence." Even assuming error, there was no prejudice under any standard. (*People v. Richardson, supra,* 43 Cal.4th at p. 1020.) The jury was also instructed that "[w]hether some instructions apply will depend on what you find to be the facts. Disregard any instruction which applies to facts determined by you not to exist. Do not conclude that because an instruction has been given, I am expressing an opinion as to the facts." We see no prejudice in light of these instructions. (See *People v. Barnett* (1998) 17 Cal.4th 1044, 1153 [74 Cal.Rptr.2d 121, 954 P.2d 384].) Moreover, the instruction does not impermissibly lessen the prosecutor's burden of proof even when erroneously given. (*People v. Valdez* (2004) 32 Cal.4th 73, 138–139 [8 Cal.Rptr.3d 271, 82 P.3d 296].) While we assume without deciding that giving the instruction was error, so instructing does not demonstrate judicial bias, nor, as defendant asserts, that "the instructions were so one-sided in favor of the prosecutor, that a fair trial within the meaning of the federal Constitution was impossible."

---

[9] The jury was instructed: "If you find that a defendant attempted to suppress evidence against himself in any manner, such as by concealing evidence, this attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, this conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide."

#### d. *Flight instruction*

Defendant contends the flight instruction was improper under the circumstances of this case, and demonstrates judicial bias. Not so.

 The court gave the jury the standard language of CALJIC No. 2.52.[10] In general, a flight instruction "is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt." (*People v. Ray* (1996) 13 Cal.4th 313, 345 [52 Cal.Rptr.2d 296, 914 P.2d 846]; see § 1127c.) Flight requires " 'a purpose to avoid being observed or arrested.' " (*People v. Visciotti* (1992) 2 Cal.4th 1, 60 [5 Cal.Rptr.2d 495, 825 P.2d 388].)

Here, following the capital crimes, defendant fled the scene, and police searched unsuccessfully for him in 1991 and 1992. He was ultimately arrested more than four years after the crimes at the Los Angeles International Airport. "This is sufficient evidence to warrant instructing the jury to determine whether flight occurred, and, if so, what weight to accord such flight. [Citation.] Moreover, the instruction given adequately conveyed the concept that if flight was found, the jury was permitted to consider alternative explanations for that flight other than defendant's consciousness of guilt." (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055 [60 Cal.Rptr.2d 225, 929 P.2d 544].) Contrary to defendant's assertion, the instruction properly allowed "the jury to determine to which offenses, if any, the inference [of consciousness of guilt] should apply." (*People v. Mendoza* (2000) 24 Cal.4th 130, 180 [99 Cal.Rptr.2d 485, 6 P.3d 150].) Likewise, and also contrary to defendant's assertion, a flight instruction does not create an unconstitutional permissive inference or lessen the prosecutor's burden of proof, and is proper even when identity is at issue. (*Id.* at pp. 179–181; *People v. Mason* (1991) 52 Cal.3d 909, 942–943 [277 Cal.Rptr. 166, 802 P.2d 950].)

#### 6. *Alleged Prosecutorial Misconduct*

 Defendant contends the prosecutor engaged in pervasive prejudicial misconduct. Defendant did not object below to any of these portions of the

---

[10] "The flight of a person immediately after the commission of a crime, or after he's accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding whether a defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide."

argument or other challenged statements, no exception to the general requirement of an objection is applicable, and the claims are therefore forfeited. (*People v. Schmeck* (2005) 37 Cal.4th 240, 286 [33 Cal.Rptr.3d 397, 118 P.3d 451] (*Schmeck*).) They are also meritless. A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact. (*People v. Ayala* (2000) 23 Cal.4th 225, 283–284 [96 Cal.Rptr.2d 682, 1 P.3d 3].)

■ Defendant contends that the prosecutor committed misconduct by improperly involving himself with the selection of counsel to replace Aquilina, and that this misconduct warrants either dismissal of all charges or a new trial. Contrary to defendant's assertion, while the prosecutor noted nonpanel attorneys had been appointed in other cases, he never mentioned who was appointed in those cases, or otherwise suggested which attorney should replace Aquilina. More critically, the prosecutor, like the defendant, has a right to a speedy trial. (Cal. Const., art. I, § 29; see Pen. Code, § 1050, subd. (a).[11]) While defendant claims the prosecutor did not assert this right until the prosecutor's own trial schedule cleared, he fails to demonstrate the prosecutor was thereby estopped to object to a continuance of at least 12 months in a case already more than seven years removed from the date of the capital crimes. Far from engaging in misconduct, the prosecutor properly urged the court to explore avenues, including replacement of counsel, that would bring this long-delayed case to trial.

■ Defendant further contends the prosecutor committed misconduct when he argued what evidence the jury could rely on in finding there was intent to kill Montoya. First, defendant contends the prosecutor relied on false testimony and thereby committed misconduct by arguing the jury could find intent to kill based on the number of times defendant lunged at Montoya with the knife, and in describing Montoya's injuries, in violation of his Fourteenth Amendment due process and fair trial rights. "Under well-established principles of due process, the prosecution cannot present evidence it knows is false and must correct any falsity of which it is aware in the evidence it presents, even if the false evidence was not intentionally submitted." (*People v. Seaton* (2001) 26 Cal.4th 598, 647 [110 Cal.Rptr.2d 441, 28 P.3d 175].) Montoya testified that defendant lunged at him with the knife at least 20 times, and that, following the attack, he could not use his arm for six or seven months. Defendant asserts that Montoya's testimony was inconsistent

---

[11] Section 1050, subdivision (a) provides in relevant part: "[T]he people, the defendant, and the victims and other witnesses have the right to an expeditious disposition, and to that end it shall be the duty of all courts and judicial officers and of all counsel, both for the prosecution and the defense, to expedite these proceedings to the greatest degree that is consistent with the ends of justice."

with his preliminary hearing testimony and statement to Clark,[12] statements of which defendant was aware. Any inconsistency between Montoya's pretrial statements and trial testimony does not ineluctably demonstrate his trial testimony was false, or that the prosecutor knew it was false. (See *People v. Riel* (2000) 22 Cal.4th 1153, 1211–1212 [96 Cal.Rptr.2d 1, 998 P.2d 969] [the prosecutor is not responsible for a witness's erroneous testimony so long as he provided discovery contradicting that testimony and the defendant was given the opportunity to point out the discrepancy to the jury].) Indeed, defendant did not even attempt to impeach Montoya with any prior inconsistent statements regarding the severity of his injury or the number of times he was stabbed. In any event, defendant's intent to kill was demonstrated by his repeated attempts to stab Montoya, and his immediately ensuing murders of Moncada and Navarro by the same means. The precise number of times he attempted to stab Montoya, or the length of Montoya's rehabilitation, was irrelevant.

Defendant also asserts the prosecutor committed misconduct when he argued that defendant's conduct in killing Moncada and Navarro demonstrated his intent to kill Montoya. As discussed above, these murders were pertinent to the issue of defendant's intent when he attacked Montoya; hence, there was no misconduct. Nor, for this reason, did the trial court err in failing to instruct the jury that defendant's "post-crime conduct was 'irrelevant to ascertaining defendant's state of mind.' "

Defendant asserts the prosecutor also committed misconduct when he argued there was no evidence of a fight before defendant's violent attacks. The prosecutor actually argued that the killings were not justified: "There's no assertion of self-defense. There was no fight taking place." This statement was supported by the record. No misconduct is apparent.[13]

Defendant contends the prosecutor falsely argued "[t]here's no evidence whatsoever that there [were] two people stabbing." This statement was a

---

[12] In his statement to Clark, Montoya stated he "wasn't counting," but he "would figure . . . a total of at least 13 times [the perpetrator] came at me." At the subsequent preliminary hearing, Montoya testified that defendant tried to stab him "repeatedly," or "[m]ore than four times." He also testified that "[t]hey didn't believe I was going to be able to use my arm and lift heavy objects with it," but by the time of the preliminary hearing nearly six years later, he had regained full strength.

[13] Defendant summarily asserts that there was "no evidence" to support the prosecutor's argument that Moncada and Navarro were killed because defendant, a "young punk, . . . made a decision and acted on that decision to dominate the moment, perhaps to impress some girls or perhaps just . . . for the pleasure of indiscriminately killing two young men in the prime of their lives." This comment appears to be a reasonable inference from the record, which failed to reveal a precise motive for defendant's murderous assault. (*People v. Dennis* (1998) 17 Cal.4th 468, 522 [71 Cal.Rptr.2d 680, 950 P.2d 1035] ["Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial."].)

reasonable inference from the record. Officer Foy testified that when she "very briefly" interviewed Montoya across the street from the scene of the attack he told her "two Mexican males stabbed him." The interview then ceased abruptly because "a female" ran across the street "screaming hysterically that someone had been stabbed." Hence Officer Foy had no opportunity to allow Montoya to elaborate on this statement. Montoya, who testified regarding only one attacker, had no recollection of making the statement.

Moreno, who testified that one person came to the side of his Prelude, was asked on cross-examination whether he told police the night of the incident that " 'I think it was two guys that came to the car.' " Moreno agreed he had made this statement, but said, "I wasn't sure, but I can only confirm that there was one, and that was the one that was doing the attacking that broke the window." On redirect, Moreno clarified that he thought that maybe there were two assailants when he heard what sounded like a gunshot, and he "wasn't sure if it was one or two people that were doing the shooting." When he got out of his car, however, he saw only one person.

Nor did the prosecutor mislead the jury by arguing that both Montoya and Moreno provided explanations for their earlier inconsistent statements. Rather, the prosecutor recounted his redirect examination of Moreno, in which Moreno clarified why he originally thought there were two assailants, and noted that Montoya "only saw one person over there, and it was the defendant." Moreover, the jury was instructed that "[s]tatements made by the attorneys during the trial are not evidence."

Defendant also contends the prosecutor misled the jury by arguing that one knife caused all of the injuries. The prosecutor said that there was "circumstantial evidence in the form of the pathologist's testimony that one knife did injuries to these individuals [that] is consistent with it being inflicted by one knife. He measured the wounds in the heart and in the organs of Bobby Navarro and Raul Moncada, and the size of that knife by those slits is consistent with it being made by the same knife. . . . And it's not just by coincidence that that scar on David Montoya's arm is approximately one to one and a half inches. It's the same knife." The pathologist testified that one knife could have caused the injuries to Navarro and Moncada, a knife approximately five inches in length and one inch wide was consistent with both victims' stab wounds, and that one of Moncada's stab wounds measured an inch and one-half in length. Montoya testified that his scar was "[a]bout an inch." The prosecutor's argument that the size of Montoya's scar demonstrated the same knife used to kill the murder victims was also used on Montoya was a reasonable inference based on the record.

Defendant contends the prosecutor engaged in misconduct by arguing that Quintana, Mesa, and Olsen could not have fabricated statements on the night of the crimes. The prosecutor simply argued that following examination of "what the witnesses said, and how they said it, and the time that they said it, you're going to see it could not have been fabricated." This was legitimate argument.

We further reject defendant's claims that the prosecutor committed misconduct in his argument regarding defendant's state of mind. Viewing the argument as a whole instead of the portions defendant cites in isolation, there is no reasonable likelihood the jury was misled by the prosecutor's argument. (*People v. Stevens* (2007) 41 Cal.4th 182, 208 [59 Cal.Rptr.3d 196, 158 P.3d 763].) Hence we reject defendant's contention that the combination of the court's failure to instruct and the prosecutor's misleading argument means that the "jury likely convicted [defendant] of first degree murder without properly considering the question of his subjective mental state."

First, defendant contends that the jury was misled when the prosecutor stated that the words "premeditated" and "deliberate" "mean essentially the same thing." Prior to making this statement, the prosecutor quoted the definitions of these terms in CALJIC 8.20, with which the jury had already been instructed. He then made the statement challenged by defendant: "Premeditated and deliberate murder. The words go together. They mean essentially the same thing. Considered beforehand, thought and considered, arrived or determined upon as a result of careful thought and weighing of considerations for and against a proposed course of action." This argument, which tracked the standard definitions of the relevant terms, was not improper or misleading.

Second, contrary to defendant's assertion, case law did not prohibit the prosecutor from arguing that the jury could find defendant premeditated and deliberated based on the totality of the circumstances, including the circumstance defendant obtained a weapon before the attacks; his choice of weapon; the manner in which he held the weapon; the number of wounds he attempted to inflict on Montoya; the circumstance that defendant was undeterred in his course of violent conduct by Montoya's rolling up the window or the seriousness of Montoya's wound; the circumstance that Moncada and Navarro were stabbed in the heart; the passage of time from the end of the argument until the attacks, during which defendant was not threatened, there was no fight taking place, and no one spoke to him; and defendant's flight following the attacks. (See, e.g., *People v. Halvorsen* (2007) 42 Cal.4th 379, 421–422 [64 Cal.Rptr.3d 721, 165 P.3d 512] [absence of provocation and location of gunshot wounds in head or neck were circumstances in support of premeditation and deliberation finding]; *People v. Moon* (2005) 37 Cal.4th 1,

28 [32 Cal.Rptr.3d 894, 117 P.3d 591] [rejecting claim that evidence of flight was irrelevant to whether the defendant premeditated and deliberated]; *People v. Memro* (1995) 11 Cal.4th 786, 863 [47 Cal.Rptr.2d 219, 905 P.2d 1305] [the jury could have concluded that during the time it took to run 178 feet from the first victim to the second, defendant considered his options]; *People v. Hawkins* (1995) 10 Cal.4th 920, 957 [42 Cal.Rptr.2d 636, 897 P.2d 574] [execution-style murder demonstrated premeditation and deliberation]; *People v. Thomas* (1992) 2 Cal.4th 489, 517 [7 Cal.Rptr.2d 199, 828 P.2d 101] [jury could have inferred defendant went to his car for a weapon before the killings].) Defense counsel was free to argue the same circumstances indicated defendant did not premeditate or deliberate, but instead counsel argued defendant was not the perpetrator. Thus, defendant did not even proceed on a theory that he was guilty of second, but not first, degree murder.

Nor, contrary to defendant's assertion, did the prosecutor argue that "the 'cold, calculated' judgment of murder is the equivalent of deciding whether to stop at a yellow light or proceed through the intersection." Rather, the prosecutor used the example of assessing one's distance from a traffic light, and the location of surrounding vehicles, when it appears the light will soon turn yellow and then red, and then determining based on this information whether to proceed through the intersection when the light does turn yellow, as an example of a "quick judgment" that is nonetheless "cold" and "calculated." He then immediately said, "Deciding to and moving forward with the decision to kill is similar, but I'm not going to say in any way it's the same. There's great dire consequences that have a difference here."

### 7. *Alleged Judicial Misconduct*

Defendant contends that he was denied the right to a fair trial due to pervasive judicial misconduct. As can be seen above, defendant asserts judicial misconduct in connection with nearly every substantive claim raised on appeal. But in fact, his arguments are merely of judicial *error*; he does not come close to showing *misconduct*. In addition to arguments already discussed, defendant also contends that jury voir dire was so permeated with error it "reach[ed] the level of structural error," and that the court demonstrated its proprosecution bias by approving a constitutionally impermissible in-court identification procedure. We have reviewed each contention, and find no error or evidence of bias. (*People v. Guerra, supra,* 37 Cal.4th at p. 1112.)

Defendant contends that during voir dire the trial court improperly defined mitigating evidence as "good things" about defendant, forcing defendant to prove " 'good things' in order to save his life," and making it "impossible for the jury to apply the law and the facts" because it "was completely misinformed regarding what constituted mitigation." Not so. The court also

informed prospective jurors that they would be given guidelines to follow in making the penalty decision. Moreover, "here the court was conducting voir dire, not instructing the jury; its comments 'were not intended to be, and were not, a substitute for full instructions at the end of trial.' " (*People v. Seaton*, *supra*, 26 Cal.4th at p. 636.) At the penalty phase, the jury was instructed in the language of CALJIC Nos. 8.85, which listed the relevant factors for the jury to consider, and 8.88, which defined aggravating and mitigating circumstances. By these instructions, the jury was fully aware what evidence could be considered mitigating.

Next, defendant contends that during voir dire, the trial court asked the jury to not find defendant guilty of second degree murder. Not so. Read in context, the trial court simply urged the jury not to find defendant guilty of second degree murder, "or something less or maybe not guilty," solely to avoid a penalty phase of the trial. This was proper.

Defendant further contends that the trial court demonstrated a bias in favor of Christian jurors by using biblical principles. First, during voir dire, the court noted that a prospective juror had stated on the questionnaire a refusal to follow the law if it conflicted with religious beliefs. The court said to the prospective juror, "We have a saying you render unto Caesar the things that are Caesar's and the things to God the things that are God's. This is Caesar's court here, all right?" The prospective juror answered, "Right." The court inquired, "Do you think that you would be able to impose the death penalty under the appropriate circumstances as I've indicated them?" The prospective juror answered, "Yes, I can."

Likewise, the court asked a different prospective juror about a notation on the jury questionnaire regarding the commandment "Thou shalt not kill." The court stated that there are two "conflicting sayings that generally come out in questionnaires when we do capital cases . . . . One is 'Eye for an eye, tooth for a tooth,' which some jurors mentioned, and the other is 'Thou shalt not kill,' and they're biblical commandments and they kind of conflict, don't they? How important is that commandment to you?" After further discussion with the prospective juror, the court again used the saying regarding Caesar, noted "[t]his is Caesar's court, the people's court basically," and "[w]e go by the rule of law, not by biblical rules. Can you make the distinction between the two?" Nothing in either this or the preceding exchange demonstrates an improper court bias toward Christian jurors. (See *People v. Jackson* (1996) 13 Cal.4th 1164, 1242 [56 Cal.Rptr.2d 49, 920 P.2d 1254] [prosecutor's argument invoking the familiar passage regarding Caesar "was not an argument for using Biblical or religious criteria of justice, but rather quite the opposite—an appeal to use secular standards mandated by law to judge defendant"].)

Nor did the trial court exhibit such a pro-Christian bias by suggesting to counsel outside the presence of the prospective jurors that a prospective juror who was a Jehovah's Witness might be impeded by her religion's tenet that she could not judge others. Nothing in this comment demonstrates judicial bias.

Next, defendant contends the trial court demonstrated an extreme hostility and bias against young people who were college students. Not so. During hardship voir dire, the court excused six full-time students. The court then said, "I should warn those of you who are sticking your hands up in the air if you're not a full-time student and we check, you're under oath. This is called lying to the Court, otherwise known as perjury, which I'm sure you've heard about recently." The court then excused two full-time students at the University of California, Riverside. After doing so, the court noted that "my husband is the academic dean at UCR also, so it's not that hard to check." The next prospective juror was a full-time student at California State University, San Bernardino. The court said, "All right. Different institution." After excusing the prospective juror, and another full-time student, the court commented, "Now you see why democracy is so hard to preserve." These comments, while perhaps somewhat intemperate, do not demonstrate a bias against young college students, but a frustration with the inherent difficulty of finding prospective jurors who have the time to hear a capital trial, and a desire to avoid "false" hardships. They do not rise to the level of judicial misconduct.

Finally, defendant contends the trial court's eagerness to allow Moreno to conduct an unconstitutionally suggestive lineup demonstrates its proprosecution bias. Not so. During Moreno's testimony, he stated that before trial he had never been shown any photographs by police, but he believed he could identify defendant. The prosecutor started to show Moreno a set of 12 photographs. Defense counsel objected, and the prosecutor ultimately withdrew the request. When Moreno's examination was completed, the court excused the jury for lunch and asked Moreno to return after lunch "in case we need you back." It then suggested to counsel, "in the event either of you wishes to proceed with this procedure," that Moreno be asked if he could identify the assailant in the courtroom, and, if he could not, the prosecutor would then show him the photo lineup. Defense counsel said "I would elect not to do it." The court expressed the view that whether Moreno could identify defendant "could be helpful to either side." The prosecutor then said he was disinclined to follow this procedure because of "raising an issue [on appeal] that probably doesn't need to be raised." The court said, "Fair enough. I don't know your case as well as you do, which is why I leave it in your hands." Nothing in this discussion demonstrates improper "eagerness" or judicial bias. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1155 [36 Cal.Rptr.2d 235, 885 P.2d 1] ["Insofar as defendant contends that an in-court

identification not preceded by a lineup is impermissibly suggestive and prejudicial as a matter of law, he is wrong."].)

In sum, we conclude there was no error, and no evidence of judicial misconduct.

### 8. *Cumulative Prejudice*

Defendant asserts that even if the errors alleged above are not in themselves reversible, they are so cumulatively. We disagree. We have assumed error only in the instruction of the jury on concealment of evidence and on lying in wait as a theory of first degree murder. For both of these claims, we concluded there was no prejudice under any standard. Therefore no cumulative prejudice is demonstrated. "Defendant has merely shown that his ' "trial was not perfect—few are." ' . . ." (*People v. Cooper* (1991) 53 Cal.3d 771, 839 [281 Cal.Rptr. 90, 809 P.2d 865], citation omitted.)

### B. *Penalty Phase Issues*

### 1. *Alleged Prosecutorial Misconduct*

Defendant contends the prosecutor committed misconduct during his closing argument. Defendant did not object below to any of the cited portions of the argument. Other than as noted below, no exception to the general requirement of an objection is applicable, and the claims are therefore forfeited. (*Schmeck, supra,* 37 Cal.4th at p. 286.) Nor was there prejudicial misconduct, either as to the individual contentions or cumulatively.

Defendant contends the prosecutor improperly stated that defendant was arrested in September 1995 whereas he in fact turned himself in. The parties stipulated defendant was arrested on September 19, 1995, and defense counsel expressly declined to introduce evidence that defendant voluntarily surrendered. No misconduct appears. For the same reason, the prosecutor did not engage in misconduct when he asked Navarro's father and sister, respectively, what it was like for them during the years before defendant was "arrested" or "caught." Nor can misconduct be attributed to the prosecutor when Montoya testified, "[w]hen they finally *caught* him, . . . it brought back so much. It was hard." (Italics added.)

Likewise, the prosecutor did not engage in misconduct when he argued, "Don't forget about David Montoya. His injuries, the months of therapy and recovering that he had to go through, his physical injuries, his mental injuries. Think about it. The anguish of surviving and the guilt that he felt." While there was no testimony that Montoya had received therapy for his injuries, he

did testify he was told by doctors he would never use his arm again, and that he in fact could not use it for six to seven months. The prosecutor's statement about therapy neither "so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process" (*Romano v. Oklahoma* (1994) 512 U.S. 1, 12 [129 L.Ed.2d 1, 114 S.Ct. 2004] (*Romano*)) nor involved deceptive or reprehensible methods employed to persuade the trier of fact (*People v. Ayala, supra,* 23 Cal.4th at p. 284).

Defendant contends the prosecutor referred to facts not in evidence when he argued that the victims suffered before they died, and that the knife made an audible sound when it entered their bodies. These were reasonable inferences from the record.

Defendant contends the prosecutor committed misconduct by arguing at the *guilt* phase, "It's time that [defendant's] held accountable after all these years for the mayhem, for the murder that he created that night." He further challenges the prosecutor's opening statement at the penalty phase in which he said, after noting he anticipated that the families of the murder victims would testify, and describing the attacks on Gonzalez and Lopez, that "[t]he accomplishments of [defendant] in his life ha[ve] been murder and mayhem." Defendant contends there is no evidence defendant committed mayhem, and that the "argument suggested the prosecutor had knowledge that [defendant] had committed heinous conduct not supported by any facts in the record. If the jurors believed that [defendant] had disfigured someone, they would have been more likely to sentence him to die. For this reason, the sentence of death should be set aside."

There is no reasonable likelihood the jury would be misled by these brief remarks. The jury was instructed that "[s]tatements made by the attorneys during the trial are not evidence," and that "[i]f anything concerning the law said by the attorneys in their arguments or any other time during the trial conflicts with my instructions on the law, you must follow my instructions." We presume the jury followed these instructions. (See, e.g., *People v. Ledesma* (2006) 39 Cal.4th 641, 684 [47 Cal.Rptr.3d 326, 140 P.3d 657].) Moreover, jurors not instructed on mayhem were unlikely to attribute to that word its legal definition,[14] or, in particular, to focus on its mention of disfigurement. In any event, we reject defendant's argument that in a case in which defendant murdered two individuals and stabbed another causing an injury that took months to heal, and in which there was aggravating evidence he had stabbed and caused severe debilitating injury to two other individuals,

---

[14] Section 203 provides that, "Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem."

there is any reasonable possibility a different penalty verdict would result from any belief on the part of the jury defendant may have also disfigured one of these individuals.

Defendant next contends the prosecutor committed *Davenport* error by arguing that the lack of mitigating evidence proved defendant's life was not worth sparing. (*People v. Davenport* (1985) 41 Cal.3d 247, 288–290 [221 Cal.Rptr. 794, 710 P.2d 861].) The prosecutor argued: "He's had eight years . . . since the commission of these brutal murders since 1991. Eight years. Over three years since the time of his arrest in September of '95. He's had an attorney, investigators preparing his case, going to Mexico to find witnesses and bring them here to court to testify for you. And what you saw is the best that they could do to give you a reason to spare his life. . . . Nothing about the defendant's childhood, his mother, or good behavior in some particular circumstances in Mexico, overcomes the evidence in aggravation." Contrary to defendant's assertion, there is no reasonable likelihood the jury understood the prosecutor to argue that the lack of mitigating evidence was aggravating, but rather that the evidence as a whole warranted death. The same analysis applies to the prosecutor's other challenged comments. Nor did the prosecutor mislead the jury by saying defendant had "an attorney" for three years, when in fact he had three attorneys over that period of time, or by referring to "investigators," when defendant only had one investigator at the time of trial.

 Defendant contends the prosecutor improperly argued that mitigating factors were actually aggravating factors. We have held that a prosecutor may not argue that a defendant's section 190.3, factor (k) character and background evidence is an aggravating factor. (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1033 [254 Cal.Rptr. 586, 766 P.2d 1].) No such mischaracterization occurred here. Rather, the prosecutor merely argued that defendant's lack of prior felony convictions deserved little weight in mitigation, that defendant, who was 21 years of age at the time of the offense, was "[o]ld enough to be held personally accountable and responsible for his actions," and that "[w]hen you look at the evidence in this case, the evidence in aggravation, and you compare it to the evidence that's been presented in so-called mitigation, there is no comparison." Such argument is entirely appropriate. (See *People v. Jones* (1997) 15 Cal.4th 119, 184 [61 Cal.Rptr.2d 386, 931 P.2d 960].) Nor, contrary to defendant's contention, did the prosecutor's reference to defendant's age tell the jury defendant's age should not be considered or preclude the jury from determining whether "21 years was youthful."

Defendant also contends the prosecutor misled the jury with respect to the consideration of mitigating evidence. Contrary to defendant's assertion, the prosecutor did not argue that "mercy and sympathy had no place in a capital

case." Rather, he properly argued that defendant had not earned the jury's pity or sympathy, and that a death verdict was compelled by the evidence.

Nor, contrary to defendant's assertion, did the prosecutor during penalty argument characterize mitigating evidence as "good things" about defendant. Rather, he told the jury it could consider "things like sympathy and pity for the defendant," and that the expanded section 190.3, factor (k) instruction was "a catchall. Anything they want to present to you falls into this category."

Contrary to defendant's assertion, the prosecutor did not make an improper biblical reference, or commit *Caldwell* error[15] (*Caldwell v. Mississippi* (1985) 472 U.S. 320, 336 [86 L.Ed.2d 231, 105 S.Ct. 2633]), when he said: "You are not here to forgive. That is for some other authority. You are here to impose punishment—the appropriate punishment based on what this defendant deserves by his conduct, by his actions." Nothing in these statements misled the jury " 'as to its role in the sentencing process in a way that allow[ed] the jury to feel less responsible than it should for the sentencing decision.' " (*Romano, supra,* 512 U.S. at p. 9.) Nor did the prosecutor improperly testify by arguing that if defendant received a sentence of life imprisonment without the possibility of parole, he would be fed, have his medical and dental needs attended to, and be able to read, write, and enjoy friendships. These circumstances are matters of common knowledge. (See *People v. Bradford, supra,* 14 Cal.4th at pp. 1063–1064 ["it is a matter of common knowledge that women are employed as state prison guards"].) In *People v. Hill* (1998) 17 Cal.4th 800, 838 [72 Cal.Rptr.2d 656, 952 P.2d 673], on which defendant relies, we did not elaborate on what argument the prosecutor made regarding prison conditions that while "brief and mild," "contributed to the overall unfairness of the trial." Nor, contrary to defendant's contention, were the prosecutor's discussion of punishment, his statement that a death verdict takes great courage, and his argument that defendant's crimes warranted death, "[i]nvitations to the jury to perform a greater social purpose" or to "consider prejudicial and irrelevant matters as aggravating factors." (See *People v. Zambrano* (2007) 41 Cal.4th 1082, 1177–1179 [63 Cal.Rptr.3d 297, 163 P.3d 4].) Likewise, arguing that life imprisonment is not sufficient punishment does not mislead the jury that it is no punishment at all.[16]

---

[15] The claim under *Caldwell* is cognizable because the trial here occurred before our decision in *People v. Cleveland* (2004) 32 Cal.4th 704 [11 Cal.Rptr.3d 236, 86 P.3d 302]. (See *id.* at pp. 761–762.)

[16] Defendant also claims misconduct in certain statements made by the prosecutor in his opposition to the automatic motion for modification of the judgment, and at the hearing on that motion. Contrary to defendant's assertion, none of the cited comments misstates either the

### 2. *Instructional Issues*

Defendant contends the trial court erred in refusing to give three proposed instructions. Not so.

■■■ The first proposed defense instruction[17] was properly refused because it duplicated other instructions given. (*People v. Gurule* (2002) 28 Cal.4th 557, 659 [123 Cal.Rptr.2d 345, 51 P.3d 224].) Thus, the jury was instructed on the definition of aggravating and mitigating circumstances,[18] and that "[i]n determining penalty, the jury shall take into consideration pity and sympathy for the defendant." In addition, instructions in the language of CALJIC No. 8.85 allowed consideration of "any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." Moreover, a trial court is not required to instruct the jury that mitigating evidence need not be proved beyond a reasonable doubt. (*People v. Samayoa* (1997) 15 Cal.4th 795, 862 [64 Cal.Rptr.2d 400, 938 P.2d 2].)

Defendant further contends the trial court improperly refused to use the word "mercy" that appeared in a proposed *prosecution* instruction. The trial

___

record or what evidence may be considered mitigating. Moreover, the trial court was well aware of the record and the applicable law.

[17] The first proposed instruction provided: "The mitigating circumstances that I have read for your consideration are given merely as examples of some of the factors that a juror may take into account as reasons for deciding not to impose a death sentence in this case. A juror should pay careful attention to each of those factors. Any one of them may be sufficient, standing alone, to support a decision that death is not the appropriate punishment in this case. But a juror should not limit his or her consideration of mitigating circumstances to these specific factors.

"A juror may also consider any other circumstances relating to the case or to the defendant as shown by the evidence as reasons for not imposing the death penalty.

"A mitigating circumstance does not have to be proved beyond a reasonable doubt. A juror may find that a mitigating circumstance exists if there is any evidence to support it no matter how weak the evidence is.

"Any mitigating circumstance may outweigh all the aggravating factors.

"A juror is permitted to use mercy, sympathy and/or sentiment in deciding what weight to give each mitigating factor."

[18] The jury was instructed: "An aggravating factor is any fact, condition or event attending the commission of a crime which increases its guilt or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself. A mitigating circumstance is any fact, condition or event which does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty. [¶] . . . You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider."

court expressed concern that the word "mercy" indicated "the jury can do what they like regardless of the guided discretion that factors (a) through (k) provide. . . . Therefore, I'm not going to use the word 'mercy.' I prefer the words 'sympathy,' 'pity,' et cetera." As set forth in the previous paragraph, the jury was adequately instructed on the treatment of mitigating evidence. Nor, contrary to defendant's contention, did the trial court forbid the parties from using the word "mercy" during argument.

Defendant also contends the trial court erroneously refused to instruct the jury that: "The factors in the above list which you determine to be aggravating circumstances are the only ones which the law permits you to consider. You are not allowed to consider any other facts or circumstances as the basis for deciding that the death penalty would be an appropriate punishment in this case." We recently rejected the same claim in *People v. Ramirez* (2006) 39 Cal.4th 398, 471–472 [46 Cal.Rptr.3d 677, 139 P.3d 64]. While the prosecution introduced on rebuttal Lira's testimony regarding defendant's jail misconduct, the jury was also instructed that, other than evidence of the assaults on Gonzalez and Lopez, "[y]ou may not consider any evidence of any other crime as an aggravating circumstance." That was sufficient.

### 3. *Cumulative Prejudice*

Defendant contends that cumulative penalty and guilt phase error requires reversal. We have assumed error only in the instruction of the jury on concealment of evidence and on lying in wait as a theory of first degree murder. For both of these claims, we concluded there was no prejudice under any standard. Therefore no cumulative prejudice is demonstrated.

### 4. *Constitutionality of Death Penalty Statute*

Defendant contends the death penalty statute violates the United States Constitution in numerous respects. We have repeatedly rejected similar claims, and likewise conclude defendant's contentions lack merit.

Section 190.3, factor (a), which allows the jury to consider "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1," does not, as applied, violate the Fifth, Sixth, Eighth, or Fourteenth Amendments to the United States Constitution because those circumstances differ from case to case. (*People v. Stevens, supra*, 41 Cal.4th at p. 211; see *Tuilaepa v. California* (1994) 512 U.S. 967, 975–976, 978–979 [129 L.Ed.2d 750, 114 S.Ct. 2630].)

Contrary to defendant's assertion, the death penalty statute does not lack safeguards to avoid arbitrary and capricious sentencing or deprive defendant of the right to a jury trial, because it does not require written findings, unanimity as to the truth of aggravating circumstances, or findings beyond a reasonable doubt that an aggravating circumstance (other than § 190.3, factor (b) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence. (*People v. Prince, supra,* 40 Cal.4th at pp. 1297–1298; *People v. Stevens, supra,* 41 Cal.4th at p. 212; *People v. Cox* (2003) 30 Cal.4th 916, 971–972 [135 Cal.Rptr.2d 272, 70 P.3d 277].) Nor must a jury be instructed which factors are aggravating and which are mitigating. (*People v. Crittenden* (1994) 9 Cal.4th 83, 152–153 [36 Cal.Rptr.2d 474, 885 P.2d 887].) "[U]se of unadjudicated criminal activity during the penalty phase is permissible . . . ," and does not violate the Fifth, Sixth, Eighth, or Fourteenth Amendments. (*People v. Box* (2000) 23 Cal.4th 1153, 1217 [99 Cal.Rptr.2d 69, 5 P.3d 130].)

Defendant claims in the alternative that a preponderance of the evidence standard of proof is compelled for the findings that an aggravating factor exists, that the aggravating factors outweigh the mitigating factors, and that death is the appropriate sentence. The jury here was instructed that "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." That is sufficient. (*People v. Stevens, supra,* 41 Cal.4th at p. 212; see *Tuilaepa v. California, supra,* 512 U.S. at p. 979.) "Unlike the guilt determination, 'the sentencing function is inherently moral and normative, not factual' [citation] and, hence, not susceptible to a burden-of-proof quantification." (*People v. Hawthorne* (1992) 4 Cal.4th 43, 79 [14 Cal.Rptr.2d 133, 841 P.2d 118].) Nothing in *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856], *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], or *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], affects our conclusions in this regard. (*People v. Stevens, supra,* 41 Cal.4th at p. 212; *People v. Cox, supra,* 30 Cal.4th at pp. 971–972.)

The failure to require intercase proportionality does not violate the Fifth, Sixth, Eighth, or Fourteenth Amendments. (*Pulley v. Harris* (1984) 465 U.S. 37, 50–51 [79 L.Ed.2d 29, 104 S.Ct. 871]; *People v. Cox, supra,* 30 Cal.4th at p. 970.) Nor does the circumstance that intercase proportionality review is conducted in noncapital cases cause the death penalty statute to violate defendant's right to equal protection and due process. (*People v. Turner* (1994) 8 Cal.4th 137, 209 [32 Cal.Rptr.2d 762, 878 P.2d 521]; *People v. Cox* (1991) 53 Cal.3d 618, 690–691 [280 Cal.Rptr. 692, 809 P.2d 351].) "[C]apital and noncapital defendants are not similarly situated and therefore may be treated

differently without violating constitutional guarantees of equal protection of the laws or due process of law . . . ." (*Manriquez, supra,* 37 Cal.4th at p. 590.)

We reject defendant's argument that the death penalty statute is contrary to international norms of humanity and decency, and therefore violates the Eighth and Fourteenth Amendments. Defendant points to no authority that "prohibit[s] a sentence of death rendered in accordance with state and federal constitutional and statutory requirements." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 511 [117 Cal.Rptr.2d 45, 40 P.3d 754].)

### 5. *Alleged Juror Misconduct*

Defendant contends that the trial court erred in denying his new trial motion, asserting the jurors commented on his failure to testify. There was no prejudicial juror misconduct, and the motion was properly denied.

#### a. *Factual background*

On March 2, 1999, a month after the penalty verdict, defendant filed a motion to release juror identifying information, or, in the alternative, for an evidentiary hearing regarding alleged juror misconduct in discussing defendant's failure to testify. The parties stipulated, and the court approved, a procedure in which all 13 jurors were subsequently summoned to court and examined individually under oath.[19] At the subsequent evidentiary hearing, Juror No. 8 recalled that a comment regarding defendant's failure to testify was made "only after we had put in our verdict."[20] Jurors Nos. 1, 2, 3, 4, 6, 7, and 11 testified that after the penalty phase deliberations, when the verdict had been reached, and the bailiff either called or the verdict was given to the bailiff, someone, identified by Jurors Nos. 1, 2, 3, and 11 as Juror No. 8, made a comment wondering why defendant had not testified. Juror No. 3 apparently agreed with the comment or made a similar comment. Juror No. 11 testified she said that was not a factor to consider, and Juror No. 12 agreed with her. Juror No. 9 could not recall whether the comment about defendant's failure to testify was made after the verdict was signed and the jury was waiting to go back into the courtroom, or later when the jurors spoke with the attorneys.

Juror No. 10 testified that at the beginning of the guilt phase deliberations, a male juror questioned why defendant did not take the stand. Juror No. 11

---

[19] After the guilt phase, Juror No. 5 was replaced by Juror No. 13, who served at the penalty phase. Both jurors were examined at the posttrial evidentiary hearing, for a total of 13 jurors.

[20] Juror No. 8 was the first juror to testify regarding the comment being made "after" the verdict. Subsequent jurors testified the comment was made after the verdict was reached, but before it was announced in open court.

responded, "We're not supposed to even consider that" and "[i]t was in our instructions not to consider it." The issue was not raised again. Later, someone mentioned that the subject had been brought up, and someone said, "[A]gain, we're not supposed to consider that."

Juror No. 12 testified that during a break at the end of the guilt phase deliberations, Juror No. 8 made a comment to the effect that, "If it had been me, I would have got[ten] on the stand to defend myself." Another juror said, "Yeah, me too." Juror No. 12 said, "we were told that's not supposed to be considered." After either the guilt or penalty verdict was read and the jury polled, Juror No. 12 returned to the jury room and Juror No. 8 said, "I feel we made the right decision because I didn't see any remorse." Juror No. 12 believed the comment was made after the guilt phase, because while she returned to the jury room after the penalty verdict was delivered to collect her belongings, she did not stay to speak to the attorneys.

Juror No. 5, who served only at the guilt phase, heard no comment about defendant's failure to testify, and Juror No. 13, who served only at the penalty phase, heard no such comment prior to the time the penalty verdict was entered.

The trial court denied the motion for new trial, finding there was no substantial likelihood that the vote of any juror was influenced by the comments, because the comments made during the guilt phase elicited "appropriate statements . . . that such matters must not be considered," and those in the penalty phase were made after the jury had reached a verdict. The court stated that any presumption of prejudice was "clearly rebutted by evidence of the responses made by the other jurors, the context of the comments, the timing of the comments, and the fact that the jurors were unanimous in stating that the comments were not ever made at a time when they were actually engaged in deliberations."

b. *Analysis*

"[B]y violating the trial court's instruction not to discuss defendant's failure to testify, the jury committed misconduct. [Citations.] This misconduct gives rise to a presumption of prejudice, which 'may be rebutted . . . by a reviewing court's determination, upon examining the entire record, that there is no substantial likelihood that the complaining party suffered actual harm.' " (*People v. Leonard* (2007) 40 Cal.4th 1370, 1425 [58 Cal.Rptr.3d 368, 157 P.3d 973].) " 'Whether prejudice arose from juror misconduct . . . is a mixed question of law and fact subject to an appellate court's independent determination.' " (*People v. Danks* (2004) 32 Cal.4th 269, 303 [8 Cal.Rptr.3d 767, 82 P.3d 1249].) "However, '[w]e accept the trial court's credibility

determinations and findings on questions of historical fact if supported by substantial evidence.' " (*Id.* at p. 304.)

Here, at the guilt phase, the circumstance that only two jurors recalled that any juror had commented on defendant's failure to testify indicates that the discussion was not of any length or significance. In addition, the offending juror was immediately reminded he could not consider this factor and the discussion ceased. (*People v. Loker* (2008) 44 Cal.4th 691, 749 [80 Cal.Rptr.3d 630, 188 P.3d 580] (*Loker*).) "Transitory comments of wonderment and curiosity" about a defendant's failure to testify, although technically misconduct, "are normally innocuous, particularly when a comment stands alone without any further discussion." (*People v. Hord* (1993) 15 Cal.App.4th 711, 727–728 [19 Cal.Rptr.2d 55].)

At the penalty phase, the comment was not made until the verdict was reached and the bailiff contacted. While the jury had not yet been dismissed, we conclude there is no substantial likelihood a passing comment at this stage of the proceedings regarding the failure to testify prejudiced defendant in any manner. Moreover, the offending juror was reminded that this consideration was not permitted. "Under these circumstances, the purpose of the rule against commenting on defendant's failure to testify was served, and the presumption of prejudice is rebutted." (*Loker, supra,* 44 Cal.4th at p. 749.)

Defendant further contends that his death sentence should be vacated because a juror stated, after either the guilt or penalty verdict was read, that the jury had made the right decision because he did not see defendant express remorse. The trial court found, however, that the comment regarding remorse recounted by Juror No. 12 was consistent with the testimony of other jurors that such a comment was made after the penalty verdict had been "signed, sealed and delivered." Substantial evidence supports that finding.

Defendant contends the trial court's questioning was not "even-handed," and that the court "did not adequately question jurors as to the actual statements made, while delving into the deliberative process questioning them in a leading manner [and] minimizing the misconduct at every opportunity." Defense counsel agreed to the trial court's intended scope of questioning before the jurors were examined, and all but one request he made for further questioning following a juror's voir dire was honored.[21] Indeed, after the first

---

[21] The request that was denied was during the questioning of Juror No. 5. He testified that during the guilt phase deliberations, another juror made a comment about how defendant "never looked at any of the people around him, he just kept looking straight." Juror No. 5 could not remember if anyone responded. Juror No. 5 agreed with the court that the comment had nothing "to do with [defendant] not taking the witness stand." At sidebar, defense counsel asked the court to inquire what the juror remembered being said before and after the comment

12 jurors had testified, the parties were asked if they wanted to recall any juror for further questioning, but neither counsel requested to do so. Rather, defendant requested that Juror No. 5, who had served only at the guilt phase, be examined, a request the court granted. Defendant has therefore forfeited any claim the questioning was inadequate. Nor does our examination of the record reveal any such inadequacy, lack of evenhandedness, or an attempt on the part of the court to improperly lead the jurors or minimize any misconduct.

Contrary to defendant's assertion, the trial court never "warn[ed]" the jurors "that unfavorable testimony could result in the reversal of [defendant's] conviction." We also reject defendant's claim the trial court was biased in its ruling. Our review of the record, set forth above, demonstrates no evidence of bias. (*People v. Guerra, supra,* 37 Cal.4th at pp. 1111–1112.)

### 6. *Imposition of $10,000 Restitution Fine*

Defendant contends the trial court improperly imposed a $10,000 restitution fine under former section 1202.4 without considering his ability to pay. Defendant concedes he is liable for the minimum statutory amount, and seeks a reduction to that amount under the current statute, which is $200.

At the time the crimes were committed, former section 1202.4, subdivision (a) provided that the fine "shall be ordered regardless of the defendant's present ability to pay," and Government Code former section 13967, subdivision (a) set the fine at a range from $100 to $10,000. (See Stats. 1990, ch. 45, § 2, pp. 256–257, 261; *People v. Saelee* (1995) 35 Cal.App.4th 27, 30 [40 Cal.Rptr.2d 790] ["A restitution fine qualifies as punishment for purposes of the prohibition against ex post facto laws."]; *People v. Hanson* (2000) 23 Cal.4th 355, 361–363 [97 Cal.Rptr.2d 58, 1 P.3d 650] [restitution fines are punishment for purposes of double jeopardy]; *People v. Walker* (1991) 54 Cal.3d 1013, 1024 [1 Cal.Rptr.2d 902, 819 P.2d 861] [restitution fine "qualifies as punishment" for purpose of enforcing plea bargain].) Defendant asserts, however, that he should receive the ameliorative benefit of a 1992 amendment to Government Code former section 13967, subdivision (a) that required the court to consider defendant's ability to pay. Defendant is not entitled to benefit from the 1992 amendment because it was repealed prior to sentencing in his case. (See *People v. Vieira* (2005) 35 Cal.4th 264, 305 [25 Cal.Rptr.3d 337, 106 P.3d 990] (*Vieira*).)

---

on defendant's demeanor. The court noted the subject of a response had been covered, and declined to inquire further because "[o]bviously it wasn't anything concerning the defendant's failure to testify."

We have, however, also held that because the current restitution statute provides that when imposing a fine in an amount greater than the statutory minimum the trial court should consider a defendant's "inability to pay" (along with other relevant factors), a defendant on appeal is entitled to benefit from the ameliorative effect of that statute. (§ 1202.4, subd. (d); *People v. Richardson, supra,* 43 Cal.4th at p. 1038; *Vieira, supra,* 35 Cal.4th at pp. 305–306.) In *Richardson* and *Vieira,* we remanded the case to the trial court " 'for reconsideration of the question of a restitution fine under the currently applicable statute.' " (*Richardson, supra,* 43 Cal.4th at p. 1038, quoting *Vieira, supra,* 35 Cal.4th at p. 306.)

Defendant does not rely on *Vieira,* which was decided before he filed his reply brief, and which was cited in respondent's brief. Moreover, in 1999, when defendant was sentenced, former section 1202.4 contained language regarding a trial court's consideration of the defendant's ability to pay similar to that contained in the current statute. (Stats. 1998, ch. 587, § 5.5.) Defendant did not assert below that he should benefit from the ameliorative effect of this amendment.

Defendant contends, however, that because he did not have the ability to pay, the $10,000 fine was an unauthorized sentence, thus exempting him from having to bring his claim to the court's attention. (See *People v. Scott* (1994) 9 Cal.4th 331, 354 [36 Cal.Rptr.2d 627, 885 P.2d 1040].) Not so. Had defendant brought his argument to the court's attention, it could have exercised its discretion and considered defendant's ability to pay, along with other relevant factors, in ascertaining the fine amount. Under the current statute, and that in existence in 1999, a fine in any amount greater than the statutory minimum, and up to $10,000, is subject to the court's discretion. (§ 1202.4, subds. (b)(1), (d).) Moreover, under the statute in 1999 and now, a defendant bears the burden of demonstrating his inability to pay, and express findings by the court as to the factors bearing on the amount of the fine are not required. (§ 1202.4, subd. (d); see *People v. Romero* (1996) 43 Cal.App.4th 440, 449 [51 Cal.Rptr.2d 26] [the statute "impliedly presumes a defendant has the ability to pay," and leaves it to the defendant to adduce evidence otherwise].)

In *People v. Tillman* (2000) 22 Cal.4th 300, 302–303 [92 Cal.Rptr.2d 741, 992 P.2d 1109], we held that a prosecutor's failure to object to the trial court's not stating on the record its reasons for not imposing a section 1202.4 restitution fine waived that argument on appeal. Likewise here, in failing to assert below that he should benefit from intervening legislative amendments and in not adducing evidence of his inability to pay, defendant has forfeited the argument. Under these circumstances, no remand is required.

### III. CONCLUSION

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied August 12, 2009, and the opinion was modified to read as printed above. Moreno, J., and Corrigan, J., did not participate therein.