Filed 9/15/15  P. v. Matchett CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>STEVEN MICHAEL MATCHETT,<br><br>    Defendant and Appellant. | F067817<br><br>(Super. Ct. No. BF139767A)<br><br><br>**OPINION** |

-ooOoo-

        APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

        Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant.

        Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

### *INTRODUCTION*

        In December 2011, appellant Steven Michael Matchett attacked Vernon Mixon with a gun.  The attack occurred on a public street in Bakersfield after Matchett believed

Mixon had orchestrated a burglary of Matchett's residence approximately five months earlier. Matchett shot Mixon seven times, but he lived.

A jury found Matchett guilty of premeditated attempted murder (Pen. Code, §§ 664, 187, subd. (b), 189;[1] count 1) and assault with a semiautomatic firearm (§ 245, subd. (b); count 2). The jury also found true that Matchett inflicted great bodily injury (§ 12022.7; count 1); personally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d); count 1); personally discharged a firearm during the commission of the crime (§ 12022.53, subd. (c); count 1); and personally used a firearm (§ 12022.5, subds. (a) & (b); counts 1 & 2).

For count 1, Matchett was sentenced to life in prison (§§ 664, 187, subd. (a)), plus 25 years to life (§ 12022.53, subd. (d)). Sentence was imposed on the remaining special allegations, but they were each stayed pursuant to section 654. For count 2, Matchett was sentenced to three years (§ 245, subd. (b)), plus three years (§ 12022.5, subd. (b)), to be served consecutive to count 1.

On appeal, Matchett raises four issues. First, he claims the trial court erred when it determined he was competent to stand trial. Second, Matchett argues the trial court erred when it omitted instruction on attempted voluntary manslaughter based on provocation and/or heat of passion. Third, Matchett contends his right to confrontation was abridged when the trial court permitted the jury to hear hearsay evidence from an undisclosed confidential informant who informed law enforcement that Matchett had shot an individual and buried the firearm in a particular location. Finally, he maintains the trial court erred when it admitted several letters purportedly written by Matchett while in jail. He asserts the letters were not properly authenticated, did not qualify as a party admission, and represented inadmissible propensity evidence.

Matchett's contentions are without merit. We affirm.

---

[1]All future statutory references are to the Penal Code unless otherwise noted.

## FACTS AND PROCEDURAL HISTORY

### The trial evidence

As is his right, Matchett did not testify or provide any evidence. Below is a summary of the prosecution's case.

#### The shooting

On December 9, 2011, Vernon Mixon[2] walked to a neighborhood shopping center in Bakersfield. There he saw a man whom Mixon thought he recognized, but was not sure because the man appeared "deranged" like he had "lost [his] mind." On the way home, Mixon saw Alex Roberson, an acquaintance, and they walked together. Without warning, shots were fired and Mixon was struck three times in his side, ankle, and thigh. Roberson heard Mixon scream, and Mixon hunched over. Roberson fled.

After being shot, Mixon turned and saw Matchett walking toward him holding a gun. Despite his wounds, Mixon fought back. During the scuffle, Matchett shot Mixon four more times before fleeing. Mixon suffered additional gunshot wounds to his shoulder, neck, and hand and a grazing wound across his head. Emergency personnel responded, and Mixon was hospitalized in intensive care and required surgery. The attack left Mixon with scars on his head and stomach.

Mixon knew Matchett. Before the attack, Mixon had purchased marijuana from Matchett and they had spent time together. Their relationship, however, had ended approximately three or four months before. Matchett suspected Mixon was behind a burglary that occurred at Matchett's residence approximately five months before the attack.

During the attack, Mixon recognized both Matchett and his handgun, which he had held before. Mixon later realized it was Matchett whom he had seen earlier at the

---

[2]Mixon had convictions for attempted burglary in 2005, misdemeanor second degree burglary in 2002, and "nearly 20 years ago," first degree robbery.

shopping center. Mixon, however, initially told law enforcement he did not know his attacker and described his attacker as Hispanic because he wanted to "take care of it" himself. Later in the hospital, Mixon informed law enforcement that Matchett was his attacker, and he identified Matchett in a photographic lineup.

At trial, Mixon identified Matchett as his assailant, and he was certain of that identification. He also denied either burglarizing or orchestrating a burglary of Matchett's residence.

### Matchett's apology

Before the shooting, Roberson was also acquainted with Matchett. At some point after the shooting, Roberson had a conversation with Matchett while they were both waiting in a jail holding cell. Matchett apologized to Roberson and said he was not out for him, indicating the shooting. Instead, Matchett stated he was out for the person who had robbed him, set him up, and caused him to lose everything. Matchett told Roberson, "Sorry for startling you and having you go through this." Matchett did not use the name of his intended target but told Roberson he knew it was not Roberson.

### Matchett's brother

Matchett's brother, Brandon Matchett, testified under a grant of immunity. He lived with Matchett in July 2011 when their residence was burglarized and over a pound of marijuana, more than $4,000 in cash, and some personal items were stolen. Both Brandon and Matchett thought Mixon was responsible for the burglary. According to Brandon, Matchett was not the same after the burglary. He appeared angrier, depressed, indicated he was upset at Mixon, did not respond as much, and acted "out of it" like his "mind wasn't there."

Matchett informed Brandon that he was going to "take care of it," which Brandon assumed was a reference to Mixon. Brandon described Matchett as a "time bomb."

On the night of the shooting, Matchett returned home and Brandon thought he looked relieved. Matchett had blood on his face, and he told Brandon they needed to go

4.

to a bar to get an alibi. They went to a bar that night and Matchett admitted to Brandon that he had gone from their home in Tehachapi to Bakersfield to find Mixon; Matchett stated he shot Mixon. When they returned from the bar, Brandon asked Matchett if he was going to take care of the gun, and Matchett said, "Yes" and "Don't worry about it."

After Matchett was incarcerated, Brandon received a letter from him in which Matchett instructed Brandon to retrieve his gun and hide it somewhere. Matchett also instructed Brandon to grind down the gun's serial numbers.

### *Matchett's friend, Maurice Sales*

Maurice Sales testified under a grant of immunity. Approximately the day after the shooting, Sales accompanied Matchett to a store where he purchased lighter fluid. Sales considered Matchett his best friend and had known him for approximately eight years. At the store, Sales believed something was "weird" based on Matchett's body language and the emotions on his face. Matchett appeared irritated and sweaty.

After purchasing the lighter fluid, Sales accompanied Matchett to a location where he burned a bag that Sales believed contained clothing. Matchett told Sales that he was involved in a "scuffle and blacked out" and he heard a "gun going off." Sales drove Matchett home and Matchett asked Sales to hold something, but Sales refused. Sales was concerned Matchett was doing something illegal.

### *Informant's tip*

In March 2012, a little over three months after the shooting, Bakersfield Police Detective William Hughes was contacted by a "confidential citizen informant" who stated he knew Matchett had shot an individual. The informant knew the location of the firearm used, which was buried in a remote location near the city of Tehachapi. Hughes and other law enforcement personnel accompanied the informant to the location, where a .45-caliber semiautomatic handgun was located buried in the ground. The gun was inside a grocery bag, which also contained a box of .45-caliber ammunition. Matchett was the registered owner of the handgun.

*Forensic evidence*

Law enforcement recovered eight, .45-caliber cartridge casings from the shooting scene. A .45-caliber Colt magazine was also recovered at the scene.

Ballistics tests were conducted on seven intact casings recovered from the crime scene. All seven casings were fired from the same handgun registered to Matchett and found buried outside Tehachapi.

## *DISCUSSION*

### I. *Sufficient evidence supported the trial court's determination of competence*

Matchett asserts his convictions should be reversed because the trial court erred when it determined he was competent to stand trial. He asserts his due process rights were violated because he was unable to conduct a rational defense. We disagree.

#### A. *Background*

Prior to the commencement of trial, Matchett's counsel requested a competency evaluation pursuant to sections 1367 and 1368, which the trial court granted. The court appointed Carol Hendrix, Ph.D., to examine Matchett.

Approximately one month later, Hendrix submitted her report, which the trial court considered. Hendrix, a licensed psychologist, opined that Matchett was not mentally competent to stand trial. She determined he was unable to help his attorney in his own defense "due to the rigidity of his current thinking." She noted that, although he understood the court procedures and roles of the court professionals, Matchett did not seem to realize the possible consequences of having a jury trial and was not considering options his attorney may suggest. Per Hendrix's report, Matchett was adamant about having a jury trial because he believed his faith would save him. Hendrix expressed concern that Matchett's faith was misdirected, was not "mature," and was the result of influence from a single inmate.

6.

Hendrix concluded Matchett suffered from the early onset of dysthymic disorder and adjustment disorder with depressed mood, along with cannabis and alcohol abuse. Her summary and recommendations were as follows:

> "This individual is viewed as Not Mentally Competent to stand trial. At the time of his interview there was no evidence of psychosis or major affective disorder. He is not viewed as being able to aid his attorney in his own defense. There were no symptoms of depression yet it is suspected as an underlying condition. He is at peace at this point because he believes that his faith is going to help determine the results of the trial. This would be fine if he understood that it is faith that sustains us no matter what we encounter, but not as a tool to avoid any possible consequences of alleged behavior. He is 23 years old and his choices right now will determine many years of his life. Extra time for deliberation and perhaps the input of a chaplain, family, or counseling would aid him in cooperating with his attorney."

The matter was submitted based on Hendrix's report, and Matchett was determined not presently competent to stand trial or able to cooperate with counsel. He was referred to Kern Mental Health for recommendation and evaluation pursuant to section 1370, and the matter was continued to December 18, 2012.

On December 18, 2012, the trial court reviewed a report regarding Matchett's placement and medications. Per the reporter's transcript, a "Dr. Keeton" had opined that Matchett was competent, but defense counsel requested a commitment to Patton State Hospital because Dr. Keeton's report[3] still mentioned the same "irrational thinking" that Matchett expressed before. The trial court ordered Matchett committed to the Department of Mental Health at Patton State Hospital. The trial court determined it was not medically indicated to treat Matchett with involuntary psychotropic or antipsychotic medications.

On April 3, 2013, the parties reconvened after the Medical Director of Patton State Hospital filed a certification of mental competency pursuant to section 1372, along with

---

[3]This report is not part of the appellate record.

an accompanying report. At the section 1372 hearing, both counsel submitted the matter based on the report. Rajesh Patel, M.D., staff psychiatrist, and Kimberly Light-Allende, Psy.D., staff psychologist/recorder, both recommended that Matchett be returned to court as competent to stand trial. The report referenced Hendrix's November 16, 2012, report and it explained the treatments and evaluations undertaken with Matchett, including assessments to determine his knowledge and understanding of the courtroom, functions of the court participants, his understanding of the pending charges, and the possible consequences. The report opined that Matchett's scores on those assessments indicated competency to stand trial. It further acknowledged Matchett was adamant that he would go to trial because God's will had "come through" for him, and God would not allow him to be found guilty. The report noted Matchett "does have some religious beliefs that are naïve, but they are not deemed delusional in nature by his treatment team." It indicated Matchett was "not expressing or demonstrating any psychiatric symptoms or cognitive limitations that would render him incompetent to stand trial at this time." It further determined Matchett "does not appear to present with symptoms of mental illness that would prevent him from working with his counsel. However, if counsel encounters difficulties working with [Matchett] these are likely due to [his] intentional choices."

Based on the report submitted by Patton State Hospital, the trial court determined Matchett was presently competent to stand trial and able to cooperate with his counsel. The criminal proceedings were reinstated.

Following the conclusion of the trial, the parties met on August 5, 2013, for sentencing and the trial court asked if there was any legal cause why sentencing could not go forward. Matchett's counsel stated there was and reminded the court he had expressed "numerous times" during the course of the trial his belief that Matchett was not competent. The court asked him to elaborate on those concerns, and the following exchange occurred:

8.

"[DEFENSE COUNSEL]: Well, Your Honor, in the course of the trial, even though [Matchett] acknowledged all of the evidence against him, he still had this very unreasonable, irrational belief that no matter what the evidence showed, no matter what was said against him, that God was going to save him and that he would not be found guilty by the jury; there was no possibility that he would be found guilty by the jury. And that, in my opinion, is not rational. That's not rational thinking. It's not reasonable.

"This is a problem that has been ongoing. And, in fact, it was expressed to the people at Patton State Hospital as well initially when he was assessed. And that is a second prong of competency. It's not whether or not you know what the proceedings are or you know who the judge is, the jury, where the jury sits, who the attorney is. It's also whether or not you are able to rationally assist in your defense, and that includes whether or not you are able to make a reasonable assessment as to whether or not someone should take a plea bargain instead of going to trial when the person acknowledges that there really is no defense but that God will save him.

"And so it is on that basis that I believe that [Matchett] was not competent during the trial, and I need more time, now that I have the Patton records, to further develop that as a basis for a possible motion for a new trial.

"THE COURT: Thank you. [¶] Any comment, [prosecutor]?

"[PROSECUTOR]: People would just be objecting. However, I would submit to the Court.

"THE COURT: Thank you. [¶] If I understand you correctly, [defense counsel], your assertion at this time is that your client was not behaving rationally because he believed that God would find him not guilty—or, rather, through God, the jury would find him not guilty, and based on that belief, your client refused to plea in this case and exercised his right to a jury trial, which did occur. [¶] Is that correct?

"[DEFENSE COUNSEL]: Yes, Your Honor.

"THE COURT: The record should reflect that there were times in chambers where [defense counsel] did express concern about his client's competency, and there [were] discussions involving the referral to Patton State Hospital to the extent that a [section] 1368 was run previously and [Matchett] subsequently was found competent to stand trial, which brought the case to this courtroom for hearing.

9.

"During those exchanges, all while in chambers, the query was made to Counsel as to whether there's been a changed circumstance to justify or warrant a review of [section] 1368 to determine whether the proceedings should be suspended and [Matchett] … reevaluated. It was during these discussions and conversations in chambers that there were no changed circumstances voiced or echoed or observed that would justify such a request.

"Because of those exchanges, there was never a formal motion to find [Matchett] incompetent, which would suspend proceedings and require that a psychiatrist or psychologist evaluate [Matchett] before the Court makes a ruling or determination as to [Matchett's] competency. The Court was never placed in a position to make an official ruling, and those concerns were never voiced on the record.

"For those reasons, it's very difficult to discern retrospectively as to whether [Matchett] was competent at a particular moment in time, although there were comments about competency relating to evidence that was obtained and discovered to the defense early on in the trial, if not prior to evidence being presented, specifically witness statements, as well as content from particular letters and jail calls that were highlighted by the district attorney's office to the defense and shared with the defense counsel, who, in turn, showed material to his client with zero or no effect to the demonstration nor the display. That, in and of itself, while it was commented on in chambers, was never brought to the Court's attention on record, and the Court was never asked to make a ruling to determine competency in this case.

"For those reasons, the Court does find significant [Matchett's] right to a trial, and it does appear that [Matchett] was exercising his right to a trial.

"Additionally, while there may be discussions—or may have been discussions that [Matchett] knew about the evidence, was relying on the state of the evidence, and decided to accept the state of the evidence, there was never a representation that [Matchett] could not assist his attorney in forming reasonably and rationally a defense in this case, but, rather, [Matchett] had an unwillingness to assist his attorney.

"There is a stark difference in law as to whether a client placed in [Matchett's] position is unwilling to assist his attorney or whether [he] is unable to assist his attorney.

"In this particular case, the evidence is absent as to whether [Matchett] was unable to assist his attorney and is replete with examples through discussions by the defense attorney that [Matchett] was unwilling to assist the attorney.

"For those reasons, [defense counsel], the Court did not find good cause to continue this matter based on the representation recognizing that [Matchett] has exercised his right to a trial and that trial has concluded."

## B.     *Standard of review*

State law and federal due process prohibit the trial or conviction of a mentally incompetent criminal defendant. (*People v. Dunkle* (2005) 36 Cal.4th 861, 885, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; § 1367, subd. (a).) "A defendant is mentally incompetent" if a mental disorder prevents the defendant from understanding "the nature of the criminal proceedings" or assisting counsel "in the conduct of a defense in a rational manner." (§ 1367, subd. (a).) Section 1368 sets forth the procedure for implementing section 1367 protections.

A trial court must suspend trial proceedings and conduct a competency hearing whenever substantial evidence exists, that is, evidence which raises a reasonable or bona fide doubt concerning a defendant's competence to stand trial. (*People v. Rogers* (2006) 39 Cal.4th 826, 847.) A defendant who is found incompetent must be committed to a state hospital to receive care and treatment to promote the defendant's "speedy restoration to mental competence …." (§ 1370, subd. (a)(1)(B)(i).) However, once the defendant is found "mentally competent," the criminal process resumes. (§§ 1370, subd. (a)(1)(A); 1372, subd. (a)(1).)

When reviewing a trial court's finding of competency, an appellate court determines whether substantial evidence exists to support that decision. (*People v. Dunkle, supra,* 36 Cal.4th at p. 885.) The evidence is viewed in the light most favorable to the finding. (*Ibid.*) "Evidence is substantial if it is reasonable, credible and of solid value." (*Ibid.*)

## C.    Analysis

Two of our Supreme Court cases are instructive regarding whether the trial court abused its discretion.

In *People v. Rells* (2000) 22 Cal.4th 860 (*Rells*), the defendant was found guilty of three counts of murder.  Prior to trial, proceedings were suspended after the defendant was found mentally incompetent.  (*Id.* at p. 863.)  The defendant was committed to Patton State Hospital for evaluation and treatment.  Subsequently, pursuant to section 1372, the hospital's acting medical director filed a certificate of restoration after determining the defendant had regained mental competence.  At a hearing pursuant to section 1372, both counsel submitted the matter based on the certificate of restoration and the accompanying report.  The trial court found the defendant to have recovered mental competence and the criminal proceedings were reinstated.  (*Rells, supra,* at pp. 863-864.)

On appeal, the defendant claimed, in part, that the trial court erred in its findings and presumably imposed on him the burden of proving his own mental incompetence.  The *Rells* court held it is proper to presume a defendant is again mentally competent to stand trial once the appointed mental health official has submitted a certificate of restoration.  The court held it would take a preponderance of the evidence to overcome this implied presumption at a hearing regarding the defendant's recovery of mental competency under section 1372.  (*Rells, supra,* 22 Cal.4th at p. 867.)  *Rells* noted that this presumption conforms with the certificate of restoration, which "has legal force" and establishes changed circumstances from when the defendant was found incompetent.  (*Id.* at p. 868.)

*Rells* held the defendant's claim was without merit.  At the section 1372 hearing, the defendant submitted the question of his recovery of his mental competence on the certificate of restoration filed by the acting medical director of Patton State Hospital and the accompanying report.  By submitting on the medical report, *Rells* determined the defendant either claimed to be mentally incompetent, in which case he had the burden of

12.

proof, or he claimed he was mentally competent.  In either case, the trial court did not err. (*Rells, supra,* 22 Cal.4th at p. 871.)

Likewise, in *People v. Sakarias* (2000) 22 Cal.4th 596 (*Sakarias*), the defendant was convicted of first degree murder.  Prior to trial, the defendant was found incompetent to stand trial because he was unable to assist his attorney rationally in the conduct of his defense.  Criminal proceedings were suspended and he was placed in the state hospital for treatment.  Approximately nine months later, the trial court received a certificate of restoration of competency from the department of mental health.  According to a report accompanying the certificate, the hospital's treatment team had evaluated the defendant and recommended he be returned to court on psychotropic medications.  It was determined the defendant "'could choose to cooperate rationally with counsel or [he] might choose to act out in court.'" (*Id.* at p. 617.)  Both defense counsel and the prosecutor submitted the matter on the medical documentation.  As a result, the trial court adopted the findings of the department of mental health and determined the defendant had regained his present competency to stand trial.  (*Ibid.*)

On appeal, the *Sakarias* court noted the department's report was "unequivocal" in its finding the defendant was competent.  It was also noted the defense neither presented evidence nor argument to controvert those findings.  On its record, *Sakarias* determined the trial court's decision was dependent on any presumption affecting the burden of proof.  (*Sakarias, supra,* 22 Cal.4th at pp. 617-618.)  To the contrary, *Sakarias* noted the trial court "could not do anything" but find competency based on the "substantial and uncontested evidence" from the report.  (*Id.* at p. 618.)  As such, our Supreme Court refused to address a constitutional challenge that the lower court incorrectly allocated the burden of proof at the competency hearing.  (*Ibid.*)

Here, at the section 1372 hearing, Matchett submitted the question of his mental competency recovery on the report submitted by Patton State Hospital.  Based on the filed certificate of restoration, a legal presumption existed that Matchett was mentally

13.

competent to attend trial. (*Rells, supra,* 22 Cal.4th at pp. 867-868.) The filed certificate of restoration had "legal force" and established changed circumstances from when Matchett was found incompetent. (*Id.* at p. 868.) Similar to both *Rells* and *Sakarias,* Matchett provided no evidence to overcome the presumption. Based on the uncontested evidence from Patton State Hospital, the trial court had substantial evidence to support its finding of competency. This evidence was reasonable, credible, and of solid value. (*People v. Dunkle, supra,* 36 Cal.4th at p. 885.)

Matchett, however, argues a review of the entire record discloses substantial evidence of his incompetence. Without providing a reference to the record, he asserts he made "delusional, and irrational statements" to defense counsel during the trial. He also contends his "irrational belief system" and "refusal to consider input from counsel" had not changed after he was originally found incompetent. He maintains that the report from Patton State Hospital noted the same "irrational belief system" but merely reached a different conclusion than Hendrix. As such, he insists the trial court's finding of mental competence was not supported by substantial evidence and his judgment should be reversed.

These contentions are without merit because a majority of his arguments are based primarily on "evidence" that occurred prior to the last competency hearing, i.e., his personal appearance before the shooting, how his brother described his emotional state after the burglary of their residence, and Hendrix's report. In light of the filed certificate of restoration, the law presumed Matchett had regained his competence and the trial court had substantial evidence to support its decision.

Moreover, when a competency hearing has been held and a defendant is found to be competent to stand trial, a trial court is not required to conduct a second competency hearing unless a substantial change of circumstances or new evidence is presented which raises a serious doubt regarding the validity of the competency finding. (*People v. Marshall* (1997) 15 Cal.4th 1, 33.) A trial court's obligation to order a competency

14.

hearing is generally not triggered just because a defendant engages in bizarre actions or makes bizarre statements. (*People v. Welch* (1999) 20 Cal.4th 701, 742.) Likewise, although a defense counsel's opinion is entitled to some weight, such an opinion standing alone does not require a trial court to hold a competency hearing unless the court itself has expressed a doubt regarding competency. (§ 1368; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1111-1112.)

Here, the record is devoid of any substantial change in circumstances or new evidence presented to the trial court calling into question the validity of the competency finding. The trial court had substantial evidence to support its decision. Accordingly, Matchett cannot establish error and his convictions will not be reversed.

## II.     *The trial court did not err in refusing to instruct on voluntary manslaughter*

Matchett argues the trial court had a sua sponte duty to instruct the jury on attempted voluntary manslaughter (§§ 664, 192, subd. (a)) as a lesser-included offense to the charge of attempted murder as alleged in count 1. He contends the court should have instructed the jury with CALCRIM No. 603 due to "heat of passion" and that failure requires reversal of his conviction in count 1.

### A.     *Background*

When reviewing jury instructions with both counsel, the court asked if either side had any lesser-included offenses they wanted presented. Defense counsel requested an instruction under CALCRIM No. 603, noting it was justified because the evidence showed Matchett acted in response over his belief Mixon burglarized his residence. The trial court responded as follows:

> "THE COURT:  Thank you.  Counsel, the law states that the Court must instruct on lesser-included offenses even if not requested to do so when the evidence raises a question as to whether all of the elements of the charge[d] offense are present and there's evidence that would justify a conviction of such a lesser offense.  That is the law as stated by the Supreme Court of California.

"In considering whether the evidence presented raises a question as to whether all of the elements of the charge[d] offense are present, the Court does not see it. It does appear to the Court that the evidence presented thus far does not raise a question as to whether all of the elements can be proven. It does appear, based on the evidence presented, that all of the necessary elements for the charged offenses are present in evidence and that the jury, upon considering that evidence, can find [Matchett] guilty of the offenses alleged.

"There is not a question as to whether the evidence presented will not satisfy all of the elements of the charged offenses. Those are general comments as it relates to lesser-included offenses. As to specifically whether a lesser-included offense of attempted voluntary manslaughter should be given to Count 1 attempted murder, the Court does not find that heat of passion as described in CALCRIM [No.] 603 is present as it relates to the particular time period necessary for one to engage in a heat of passion.

"The evidence certainly lacks foundation as it relates to the timing between the burglary and the incident in question as to whether [Matchett] was still under the influence of some emotion arising from that and did not have—and did not react without due deliberation and reflection.

"For those reasons, the lesser-included offense requested of attempted voluntary manslaughter is denied."

### B.    Standard of review

Even upon request by the defense, a trial court may refuse to instruct on a lesser-included offense when no evidence supports the instruction. (*People v. Daniels* (1991) 52 Cal.3d 815, 868.) Voluntary manslaughter is "the unlawful killing of a human being without malice" based upon "a sudden quarrel or heat of passion." (§ 192, subd. (a).)

Manslaughter is a lesser-included offense of murder. (*People v. Avila* (2009) 46 Cal.4th 680, 705.) Provocation is the factor which distinguishes the "'heat of passion'" form of voluntary manslaughter from murder. (*Ibid.*) "'The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim.' [Citation.]" (*Ibid.*) For heat of passion to reduce murder to voluntary

16.

manslaughter, the passion must be a type that would naturally occur in the mind of an ordinarily reasonable person under the facts and circumstances of the case. (*Ibid.*)

### C.     Analysis

Matchett maintains the trial evidence "is susceptible of interpretation that [Matchett] ran into Mixon at the shopping center, and in his deranged state acted out of a heat of passion." As a result, he asserts an instruction of attempted voluntary manslaughter was warranted. This argument is quickly rejected.

It is black-letter law that a killing is not manslaughter if sufficient time has elapsed for an ordinarily reasonable person "'to cool'" and have his or her "'passions'" subside. (*People v. Daniels, supra,* 52 Cal.3d at p. 868.) To warrant an instruction regarding manslaughter arising from provocation and heat of passion, the killing must have resulted from a "'sudden quarrel or heat of passion .…'" (*Ibid.*) Such an instruction is properly rejected if the killing was done belatedly as revenge or punishment. (*Ibid.*)

Our Supreme Court has found a manslaughter instruction not warranted where the events leading to the killing were not sufficient "'to arouse feelings of homicidal rage or passion in an ordinarily reasonable person.'" (*People v. Avila, supra,* 46 Cal.4th at p. 706 [fleeting gang reference or challenge was insufficient for reasonable person to become homicidally enraged].) Further, our Supreme Court has found a manslaughter instruction not warranted where a matter of days or months have passed from the time of the provocation to the killing. (See *People v. Pride* (1992) 3 Cal.4th 195, 250 [voluntary manslaughter instruction properly rejected where three days passed between killings and criticisms defendant received about his work performance]; *People v. Daniels, supra,* 52 Cal.3d at p. 868 [voluntary manslaughter instruction properly rejected where over two years three months passed between defendant's provocation and killing].)

Here, there was no substantial evidence of provocation. Reasonable people, as a rule, may become angry over a belief someone either broke into their residence or orchestrated the burglary, however, it seldom elevates to homicidal rage. More

17.

importantly, the burglary of Matchett's residence occurred in or around July 2011, approximately five months before Matchett attacked Mixon.  Reasonable people do not remain homicidally enraged for five months based on the facts and circumstances of this case.  On this record, the trial court did not err in refusing to instruct on attempted voluntary manslaughter.  (*People v. Avila, supra,* 46 Cal.4th at p. 707; *People v. Pride, supra,* 3 Cal.4th at p. 250; *People v. Daniels, supra,* 52 Cal.3d at p. 868.)

### III.     *Matchett cannot establish prejudice associated with the introduction of the informant's statement*

Matchett contends his Sixth Amendment right to confrontation was abridged when the trial court admitted evidence from an undisclosed confidential informant.  He also argues this evidence was erroneously admitted under state law as irrelevant nonhearsay.  He asserts his convictions should be reversed.

#### A.     *Background*

At trial, Bakersfield Police Detective William Hughes testified that an unidentified confidential informant contacted him a little over three months after the shooting and the informant was subsequently interviewed.  Hughes stated the informant provided information about the case.  When asked to explain what the informant said, Matchett's trial counsel objected under hearsay, and the prosecutor argued the testimony was going to show "subsequent actions."  The court sustained the hearsay objection but allowed Hughes's testimony "for the nonhearsay purpose of explaining this witness's subsequent conduct."  The court instructed the jury that Hughes's subsequent testimony "is not to be considered for the truth of the statement contained.  It is only to be considered as it relates to what this witness did after learning of that information.  You could consider it only for that limited purpose."

Hughes then told the jury that the informant stated Matchett had shot an individual and the firearm used had been buried near a tree at the off-ramp of Broome Road, State Route 58, near the city of Tehachapi.  The confidential informant accompanied police to

18.

the place where the gun was allegedly buried and, after a bit of digging, a .45-caliber handgun registered to Matchett was found near the identified tree, buried six inches deep and enclosed inside a plastic grocery bag.

### B.    Standard of review

In the absence of fundamental unfairness, the harmless-error test of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), is used to analyze an evidentiary error that involves state law.  (*People v. Partida* (2005) 37 Cal.4th 428, 439.)  Such an analysis requires the reviewing court to ask "whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error."  (*Ibid*.)

In contrast, a federal constitutional error is harmless under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), when the reviewing court determines beyond a reasonable doubt that the error did not contribute to the verdict.  (*People v. Aranda* (2012) 55 Cal.4th 342, 367.)

### C.    Analysis

Matchett raises two primary arguments:  First, he contends the trial court erroneously admitted the informant's statement to Hughes for an irrelevant nonhearsay purpose.  Second, he asserts introduction of the informant's statement violated his confrontation rights under the Sixth Amendment as set forth in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) and *Davis v. Washington* (2006) 547 U.S. 813.  He argues his convictions must be reversed because the jury heard he "had shot an individual" and the firearm used had been "buried" in a particular location.

The People dispute these assertions, claiming Matchett has forfeited these arguments on appeal following a failure to raise them in the lower court.  The People also argue that the content of the informant's tip was relevant, and no constitutional violation occurred because the informant's statement was admitted for a nonhearsay purpose.  Finally, the People maintain that Matchett cannot establish prejudice even if error occurred.

We need not address the parties' disputed points regarding whether or not it was relevant to admit the informant's statement; whether or not such a statement violated the Sixth Amendment under *Crawford, supra,* 541 U.S. 36, and its progeny; or whether Matchett has forfeited these claims on appeal. Instead, even if we assume error occurred that was not forfeited, reversal is not warranted because Matchett cannot establish prejudice.

Our Supreme Court has held that a constitutional challenge under *Crawford, supra,* 541 U.S. 36, can be resolved without analyzing the actual constitutional issue if any assumed error was harmless beyond a reasonable doubt. (*People v. Jennings* (2010) 50 Cal.4th 616, 652; *People v. Jenkins* (2000) 22 Cal.4th 900, 1015-1016 [finding it unnecessary to examine "complex constitutional question" because any error was harmless].) This is such a situation.

Here, after the burglary, Matchett informed his brother that he was going to "take care of it," which Brandon assumed was a reference to Mixon. Matchett indicated he was angry at Mixon, and Brandon described him as a "time bomb." On the night of the shooting, Matchett had blood on his face, wanted to create an alibi, later admitted he shot Mixon, and assured his brother he would "take care" of his gun. After he was incarcerated, Matchett asked Brandon to move the gun to another location and grind down the gun's serial numbers. After the shooting, Matchett apologized to Roberson and said he was not out for him but for the person who had robbed him, set him up, and caused him to lose everything. At trial, Mixon identified Matchett as his shooter and expressed certainty in his identification. Finally, the forensic evidence established that the buried gun registered to Matchett had fired the bullets in the attack on Mixon.

Based on this record, any assumed error associated with admitting the informant's statement was harmless beyond a reasonable doubt. Accordingly, Matchett is not entitled to reversal for any alleged Sixth Amendment violation (*People v. Jennings, supra*, 50

Cal.4th at p. 652) or under the lower *Watson* standard for any evidentiary error under state law (*People v. Partida, supra,* 37 Cal.4th at p. 439).

### IV. *Matchett cannot establish prejudice associated with the introduction of the letters he purportedly wrote*

Matchett maintains the trial court erred when it admitted several letters he purportedly wrote from the jail facility. He contends these letters were not properly authenticated and constituted inadmissible hearsay.

#### A. *Background*

After Matchett was arrested, four letters were intercepted at the Kern County Jail that were addressed to Brandon Matchett in Tehachapi. Jail officials were suspicious because the letters had the same mailing address for both the sender and the recipient.

One letter was addressed to Brandon at 21533 Golden Hills Boulevard, Apartment A, in Tehachapi, with a return address of "S. Matchett" at the same address. The other letters were addressed to Brandon at Post Office Box 2501 in Tehachapi, with a return address of "S. Matchett" at the same address.

The prosecution introduced evidence that in 2011 Matchett resided at 21533 Golden Hills Boulevard, Apartment A. The prosecution also introduced evidence that three letters were intercepted in January 2012 and a final letter was intercepted in February 2012. Matchett was housed in the jail facility when these letters were intercepted.

The letters were tested for fingerprints, which did not reveal any usable prints. In the letters, the author instructed Brandon to be ready to answer questions "in code," and it contained instructions on what Brandon and other potential witnesses should say to law enforcement. The prosecution introduced these letters into evidence.

#### B. *Analysis*

Matchett contends it was error to admit these documents into evidence because nothing established who wrote them. No fingerprints were discovered on the letters. No

21.

testimony was introduced from a witness familiar with Matchett's handwriting. No witness observed Matchett writing these letters. He argues these documents were hearsay and the prosecution failed to establish the essential foundation necessary to qualify them as a party admission. (Evid. Code, § 1220.)

Further, Matchett maintains these letters were improper "propensity" evidence and contained such detailed instructions they should be considered "tantamount to a confession." He asserts that his due process rights to a fair trial were abridged and seeks reversal under the standard set forth in *Chapman, supra,* 386 U.S. at page 24 or, in the alternative, under *Watson, supra,* 46 Cal.2d at page 836.

The People maintain the letters were adequately authenticated by their contents and the circumstances, and any error was harmless under *Watson, supra,* 46 Cal.2d at page 836.

We need not analyze or address the parties' dispute regarding whether or not the prosecution properly authenticated these documents. We also need not analyze or address whether these documents were inadmissible hearsay or "propensity" evidence. Matchett was entitled to a fair trial but not a perfect one. (*People v. Hill* (1998) 17 Cal.4th 800, 844.) His judgment will not be reversed absent a clear showing that a miscarriage of justice occurred. (*Ibid.*) As discussed above, overwhelming evidence established Matchett's guilt. Based on this record, we find the introduction of these letters was harmless beyond a reasonable doubt even were we to assume error occurred. Accordingly, Matchett cannot establish prejudice.

## *<u>DISPOSITION</u>*

The judgment is affirmed.

_____

Smith, J.

WE CONCUR:


_____

Hill, P.J.


_____

Kane, J.